**Michael Lee McBRIDE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 70174.**

Court of Criminal Appeals of Texas, En Banc.

June 16, 1993.

Rehearing Denied Sept. 22, 1993.

---

Sam Ogan, court appointed, Lubbock, for appellant.

Travis S. Ware, Dist. Atty., Lubbock, Robert Huttash, State's Atty., Austin, for the State.

**OPINION**

MILLER, Judge.

Appellant was convicted of capital murder. V.T.C.A. Penal Code § 19.03(a)(6). Upon the jury's affirmative answers to the two issues submitted at punishment, the trial judge sentenced appellant to death. Art. 37.071, V.A.C.C.P. Appellant presents thirteen points of error in this direct appeal. We will affirm the trial court's judgment.

Appellant does not challenge the sufficiency of the evidence to sustain his conviction. In his first point of error, however, he contends "the evidence adduced at trial was insufficient to prove that there is a substantial probability [he] will commit criminal acts of violence that would constitute a continuing threat to society." *See* Art. 37.-071(b)(2).[1] When reviewing a sufficiency claim, this Court must view the evidence in the light most favorable to the verdict to

---

1. *See* now Art. 37.071, § 2(b)(1).

determine whether a rational trier of fact could have found the elements of Art. 37.-071(b)(2) beyond a reasonable doubt. *Keeton v. State,* 724 S.W.2d 58 (Tex.Crim.App.1987). The jury is entitled to consider all evidence admitted at both phases of trial when deliberating on this issue. *Black v. State,* 816 S.W.2d 350 (Tex.Crim.App.1991). We therefore review the evidence from guilt/innocence and punishment in the light most favorable to the verdict.

Appellant was convicted of the shooting deaths of Christian Fisher and James Holzer, both eighteen years old. On October 18, 1985,[2] Holzer, Cody Minnick, and Karen Tidwell, went to Lubbock to visit Fisher who was attending Texas Tech University. Appellant, whom Fisher had been dating for about 11 months and with whom she had a "very stormy" relationship, was angry that Holzer and Minnick were staying in Fisher's apartment for the weekend. On Saturday, October 19, 1985, appellant entered Fisher's apartment with a key and attacked Holzer as he lay sleeping on the couch. Minnick testified appellant was screaming "[y]ou are sleeping with my girlfriend."[3] Minnick intervened, and while he and Holzer wrestled with appellant, a glass bookcase was broken in Fisher's apartment. After being subdued, appellant yelled at Fisher "to bend down and pick up" his keys, and then appellant picked up someone's sunglasses, crushed them, and threw them on the floor. Appellant then grabbed his own sunglasses and left.

The foursome (Fisher, Tidwell, Minnick, Holzer) did not hear from appellant again until Monday evening, October 21st, when he phoned Fisher. Appellant and Fisher were apparently ending their relationship, and Fisher wanted some money appellant owed her.[4] Appellant told Fisher to come to his house "alone" and he would give her a painting worth the amount he owed her. Before concluding the phone call, appellant also told Fisher "if I can't have you, nobody will."

Fisher's friends expressed concern for her safety if she were to go to appellant's house alone, so the foursome proceeded to appellant's in two cars. Fisher and Holzer parked in front of appellant's house, while Minnick and Tidwell parked several car lengths behind them. Appellant's house was very dark and no one answered when Fisher knocked at the front door. As Fisher was walking back towards the street, Minnick noticed a figure behind his car and heard a gun cock, and then appellant pointed a rifle[5] at him. Appellant demanded Minnick and Tidwell exit the car or else he would kill them,[6] and he proceeded to smash out Minnick's driver's side window with the rifle butt. Appellant also fired two shots into the air, which Minnick described as "warning shots." Appellant then turned his attention toward Fisher and Holzer, and at that time Minnick escaped to a neighbor's home for help.

A neighbor of appellant's, Patrick Potter, and Tidwell both witnessed the double homicide. Potter lived in an apartment behind a house which was across the street from appellant's. He testified that while sitting in his apartment he saw a male matching appellant's description run past his open front door. As his dogs took chase he followed and saw appellant bash out Minnick's window. Potter returned home to tell his wife to call the police, and then went back to the scene. He testified he could hear appellant loading his weapon. Tidwell testified that appellant and Fisher appeared to be struggling with the rifle in the middle of the street when appellant shot Fisher. Two university

---

**2.** The State announced ready for trial in January of 1986. Appellant moved for a continuance based on the physical injury to his head from a gunshot wound he inflicted upon himself during the commission of this offense. This motion was granted; the trial began in January of 1988.

**3.** The evidence reflected that during this weekend visit Holzer slept on the couch, Minnick on the floor, and Tidwell slept with Fisher in her room.

**4.** Minnick testified to the content of this phone conversation which he overheard on a second telephone in Fisher's apartment. Neither appellant nor Fisher knew Minnick had answered the phone at the same time as Fisher and was listening to their conversation.

**5.** The rifle was a "military version" .30 caliber M-1 carbine with a 30 round clip.

**6.** Appellant also told Tidwell that he hated her. According to Tidwell, she and Fisher were "very close friends."

students who were studying in a neighboring house also witnessed the offense, but they did not see Fisher grab for the weapon. Nevertheless, the witnesses agreed that Fisher taunted appellant before he shot her.[7] The witnesses also agreed appellant continued to shoot Fisher at close range even after she had fallen to the ground. She sustained ten gunshot wounds to her face, chest, abdomen, and thigh.

After appellant murdered Fisher, he fired several shots through the windshield of her car, repeatedly striking Holzer who was now in the driver's seat. Appellant then "hopped around" to the driver's side of the car, smashed out that window, and fired again at Holzer, at one point actually placing the rifle against his head. Holzer sustained nine gunshot wounds, one of which destroyed his heart and was fatal. Appellant then shot himself under the chin, the bullet traveling through his mouth and exiting his forehead. Police officers and EMS personnel arriving at the scene found appellant on his hands and knees on the ground apparently trying to crawl to his weapon, which several witnesses kicked away from him. He was violent and aggressive with the EMS personnel, resisting their efforts, making threatening remarks, and using profanity. He admitted shooting Fisher and Holzer "because it was time for them to go." At the hospital, appellant was more cooperative, and even commented to a male nurse that "if you ever need any pointers or information on how to handle your women, just let me know."

During guilt/innocence, there was testimony regarding appellant's relationship with Fisher. Appellant had moved to Lubbock to be with Fisher while she attended Texas Tech. He was employed as a bartender at a Lubbock country club, but Fisher helped him financially "all the time." She was apparently unhappy in Lubbock and was preparing to move home to Fort Worth in the near future. Her friends encouraged the move as appellant's behavior was "unpredictable." Fisher's mother did not like her dating appellant, and she felt that her daughter saw him "too

frequently." Tidwell described appellant as having a "very explosive, short tempered" personality, and stated Fisher reacted to him with fear but tried to help him. It was contested whether appellant and Fisher had ever been engaged.

Also during the guilt/innocence phase of trial, Tidwell testified to extraneous bad acts indicative of appellant's temper. In the spring of 1985 at a Fort Worth bar, appellant twice punched in the face a man who had borrowed a cigarette from Fisher then ignored appellant's directive to leave their table. In another incident, appellant jumped an "island" in a parking lot and drove "pretty fast" toward Tidwell (who had parked in the middle of the parking lot) and tried to run over her. Appellant apparently was angry because a few days prior Tidwell did not admit to him that she and Fisher had gone to a bar. Tidwell stated that outbursts of anger were typical behavior for appellant. Tidwell also testified during the punishment phase of appellant's trial. She stated that in the ten months she had known appellant (prior to this offense) she had seen him lose his temper many times. She again told of the two incidents mentioned above (on p. 4), and added a third in which appellant stormed into a bar where she, a friend, and Fisher were playing pool. Appellant forced Fisher to leave and "pulled her out the door." This incident occurred in January or February of 1985. Fisher's mother described an occasion during that summer when appellant became belligerent with a sheriff's deputy who did not issue a ticket to a young woman who had rear-ended Fisher's car.

Numerous other witnesses testified during the punishment phase describing incidents indicative of appellant's explosive disposition. Two Lubbock police officers testified they answered an aggravated assault call at Fisher's apartment at 4:23 a.m. just sixteen days prior to this offense. Leslie Holder, a mutual friend of the victims and appellant testified that she tried to get into Fisher's apartment during the assault as Fisher was yelling for help. After appellant fled, she and Fisher

---

7. Tidwell testified that Fisher yelled at appellant "You son of a bitch, you won't do it." The two students testified Fisher in essence said "Shoot me. Go on and shoot me." Potter said he heard Fisher say "go ahead, Mike."

found a teddy bear with its head ripped off and a note from appellant stuffed inside.[8] Earlier that same day, appellant and Holder went for a drive in appellant's truck so that he could talk to her about his problems with Fisher. It was only a short drive as appellant was "roaring up behind [cars] and then slamming on his brakes" which scared Holder. She also described an incident in Fort Worth in which appellant broke the windows in his apartment with a chair because he was angry that Fisher and Holder had gone out one evening. In 1985, appellant also became enraged and threatened a Fort Worth police officer, who also worked as a security guard at the apartment complex where appellant lived, when the officer answered a disturbance call.[9] A former manager of that same apartment complex testified that appellant tried, more than once, to destroy his third floor apartment.[10] When the manager approached him about a broken window in the apartment, appellant first reacted calmly, then violently and threatened her. Appellant later admitted that he broke the window when he lost his temper and tried to throw someone through the window. Subsequently the manager inspected the apartment in appellant's absence and discovered fist sized holes in almost every wall of the apartment, "a lot of guns", and a set of weights.[11] Appellant owed $520 in damages upon moving out. Another witness testified that in 1979 appellant drove his car through her backyard and into her garage, "knocking everything

into a bedroom." He emerged from the car swearing at her and threatened to sue her after she pushed him because she was so upset by "his language and his attitude[.]"

The State also presented testimony from persons who had been associated with appellant while he was in jail awaiting trial. Numerous incidents were detailed where appellant lost his temper, used offensive language, and/or attacked someone with little or no provocation. The evidence also showed appellant wanted to borrow an empty shampoo squeeze bottle to fill with jalapeno peppers and squirt the juice in the eyes of people who were annoying him. Further, the State presented three witnesses from Fort Worth, who attended Texas Tech, who testified that appellant's reputation for being peaceable and law-abiding was bad. Finally, a psychiatrist testified that, in his opinion, appellant would continue to be a threat to society.

In the first point of error appellant contends neither the facts of this offense alone nor the record taken as a whole is legally sufficient to sustain the jury's affirmative answer to the second punishment issue. Appellant asserts that the facts alone are insufficient even though the record reveals a senseless double homicide with an apparent plan by appellant to murder Fisher. Even assuming this contention were true, we nevertheless find the record as a whole is sufficient to sustain the jury's verdict.[12]

8. The note said:

> Dear Cris: You are a very inconsiderate little bitch. I don't think that I want to see you any more. Now you can be a lesbian or a slut or a whore, or whatever you want, without me or anybody else for the time being, to worry about or act like you worry about. You are a wonderful liar, and for this I hate your guts. Too bad, huh? Well, fuck you, too, and I will surely see you in hell.

9. Appellant told this witness, who had identified himself as a police officer, "[f]uck you[;] get out of here or I am going to kick your fucking ass."

10. Appellant's initial rental application was rejected by the manager because he was not gainfully employed and had no credit history. He was later accepted when he paid in cash three months' rent and the deposit. The manager also testified that in the nine months appellant lived there she never knew him to be employed yet he

owned a porsche and a truck. Appellant's father testified appellant had received $65,000 in a settlement of a lawsuit based on a back injury he suffered in a motorcycle accident.

11. There was previous testimony that appellant was 5'4" tall, had a stocky build, and was a weight-lifter.

12. As to the record evidence as a whole, appellant refers us to the *Keeton* factors in asserting the evidence is insufficient. In *Keeton*, 724 S.W.2d at 61, this Court cited a nonexhaustive list of factors which the jury may consider when answering the second punishment issue. In his brief in support of his claim, appellant argues the pertinent evidence in this case under each factor. For the sake of brevity we will not recite his arguments in this opinion but note the evidence: the circumstances of the offense and his agitated state of mind, no prior criminal record, his personal circumstances (he was in love with Fisher,

The evidence suggests that this offense was not "an isolated, single act of rage and violence" as appellant asserts but rather the culmination of his violent history. The circumstances of the offense are probative of the probability appellant will commit future acts of violence. *See Johnson v. State*, 853 S.W.2d 527 (Tex.Crim.App. 1992). Appellant specifically requested Fisher to come to his home the evening of this offense ostensibly to give her a painting in exchange for money owed her. When Fisher arrived, appellant's home was dark and he failed to answer the door. Instead, appellant ambushed Fisher and her friends from across the street where he apparently lay in waiting for at least Fisher's arrival. He terrorized two unarmed persons and then murdered two others. Additionally, there was substantial testimony regarding appellant's prior unadjudicated acts of violence against people and property indicating his predisposition towards violent behavior. The record reveals appellant to be an insanely jealous and volatile man with a total lack of respect for authority figures. On the basis of the record as a whole, we hold the evidence was sufficient to sustain the jury's affirmative answer to the second punishment issue. *See Delk v. State*, 855 S.W.2d 700 (Tex.Crim.App. 1993). The first point of error is overruled.

■ In his eleventh point of error, appellant contends the trial court erred in overruling his objection to the jury charge on voluntary manslaughter. Before the charge was read to the jury, appellant lodged the following objection:

> Defendant objects that the court's charge does not instruct the jury as to the ordinary person being viewed from the circumstances of the defendant at the time of the

offense. It does not provide any reference point in the instructions for how the jury is to gauge the conduct of the ordinary person under the circumstances.

The trial judge instructed the jury on the charges of capital murder, murder, and voluntary manslaughter. The trial judge defined "adequate cause" pursuant to V.T.C.A. Penal Code § 19.04 [13] as:

> 'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

The penal code has no provision defining a "person of ordinary temper." [14] After defining voluntary manslaughter, but before applying the law to the facts, the trial judge further instructed the jury:

> You are instructed that you may consider all relevant facts and circumstances surrounding the killing of James Alan Holzer,[15] if any, and the previous relationship existing between the accused and the deceased, James Alan Holzer, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the killing of James Alan Holzer, *if any*.

*See* V.T.C.A. Penal Code § 19.06.

In his brief, appellant does not contend that the Court should abandon the person of ordinary temper standard. Appellant asserts that the jury should have been instructed to place that person in the position of appellant and consider "whether a person of ordinary temper *in Appellant's situation* [ ] would have had adequate cause to react as he did." (Emphasis in original).

---

had been in the Navy, was recovering from a back injury, and worked as a bartender), that he was under extreme emotional pressure, and his psychiatric and psychological evidence.

**13.** Section 19.04, Voluntary Manslaughter, provides in pertinent part:

(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) 'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of *former provocation.*

**14.** In *Gonzales v. State*, 689 S.W.2d 900, 903 (Tex.Crim.App.1985), this Court found no violation of due process in the Legislature's failure to define the person of ordinary temper.

**15.** The exact same instruction was given as to the second victim, Fisher.

Quoting the practice commentary in *McCartney v. State,* 542 S.W.2d 156, 160 (Tex.Crim.App.1976), the Court noted:

The definition of adequate cause in Section 19.04(c) is both objective and subjective. It is objective because it views the alleged provocation through the eyes of the ordinary man; *it is subjective because the fact-finder must view from the actor's standpoint* in order to determine 'the condition of the mind of the accused at the time of the offense,' which is necessitated by the mens rea requirement and emphasized by Section 19.06, from which the quoted phrase is taken.... (emphasis supplied).

*See also Gonzales,* 689 S.W.2d 900. The trial judge's jury instructions on voluntary manslaughter tracked the statutory language in penal code sections 19.04 and 19.06 and instructed the jury that it may consider the relevant facts and circumstances of appellant's relationships with both victims which affected his state of mind at the time of the offense. The charge thus addressed the circumstances of this offense from appellant's perspective. *McCartney,* 542 S.W.2d 156. We hold the trial court properly charged the jury on adequate cause and did not err in overruling appellant's objection to the charge. The eleventh point of error is overruled.

In points of error two through eight, appellant raises error as to the testimony of Dr. Clay Griffith, a psychiatrist who was called to testify by the State during the punishment phase. Griffith first testified out of the jury's presence so that the trial judge could make a ruling on the propriety of the State's hypothetical question to the doctor encompassing the second punishment issue. After the State and defense examined Griffith, defense counsel made the following objections to his testimony:

I object to the form of the hypothetical question for the reason that it is not a properly framed hypothetical question, it is a recitation of what the prosecuting attor-

ney thinks is the evidence in this particular case, and it goes far beyond the asking of a hypothetical question assuming certain facts.

For that reason, it goes beyond touching on the ultimate issue to the jury. It takes all the facts from the prosecutor's standpoint before the jury, and invades totally the province of the jury in the form of an opinion.

That is my first objection.

My second objection is that the opinion is based, not only upon the hypothetical question, but upon discussing and reading and hearsay from third parties, done by Dr. Griffith prior to coming to trial, and that objection is recognized, is valid, and is basis for excluding the testimony from Holloway v. State on forward.

The third objection is that based on these circumstances, it does not assist the trier of fact, because it invades the province of the trier of fact, but it is framed in such a way as to be unmanagable, (sic) and that is also from the cases following Holloway v. State.

The fourth objection is that Dr. Griffith has departed from the field of—recognized field in which he is attempting to express an opinion that the body of psychiatrists generally do not accept such opinions, and by giving an opinion, he is outside his field of expertise, it would be as if asking him an opinion as to the value of cantaloupes.

It is not a matter which is within the field recognized by people practicing the profession, and, is therefore, not a proper opinion.

So, for those reasons, I object to the hypothetical and I object to the expression on the issue of future dangerousness.

■ Appellant argues in the second point of error that Dr. Griffith's testimony regarding the probability that he would commit future acts of violence was inadmissible because Griffith had no special expertise which would permit such testimony.[16] Before the

---

16. The State initially responds that appellant has waived this point of error for review because his objection at trial does not comport with his complaint on appeal. We conclude appellant pre-

served this point of error via his "fourth objection" wherein he states that Dr. Griffith was "outside his field of expertise...." This objection necessarily challenges the doctor's qualifica-

jury, Griffith stated he was a medical doctor specializing in psychiatry and practicing that specialty for twenty-eight years. He has a sub-specialty in legal psychiatry. He also testified regarding his education, his several degrees, his residency and internship, and that he is on the part-time teaching staff at the University of Texas Medical School in Dallas. Griffith had previously testified "in a number of death penalty cases" for both the prosecution and defense.

Article VII of the Texas Rules of Criminal Evidence governs the admissibility of expert witness testimony at trial. If the trial judge finds that a particular witness has specialized "knowledge, skill, experience, training, or education" on a fact at issue, and that his testimony will assist the trier of fact, then such testimony is admissible. Tex.R.Crim. Evid. 702. *See also Joiner v. State*, 825 S.W.2d 701, 707 (Tex.Crim.App.1992). In *Joiner*, we addressed the precise issue presented here, and we likewise find this record sufficiently developed regarding Griffith's qualifications to conclude the trial judge did not abuse his discretion in admitting his testimony. *Id.* at 708. The second point of error is overruled.

In his third point of error, appellant contends the trial judge erred in admitting Dr. Griffith's testimony because its probative value was outweighed by its prejudicial potential. Having failed to lodge an objection on this basis at trial, appellant has failed to preserve this alleged error for review. *Nelson v. State*, 864 S.W.2d 496 (Tex.Crim.App. 1993), at p. 499 (after Rule 404(b) objection overruled defendant required to make further objection under Rule 403 or error is waived).

■ Appellant's fourth point of error alleges error in allowing Griffith's psychiatric testimony because the State failed to show "that lay jurors are unfamiliar with a body of expertise which is relevant to the resolution of any matter at issue in the case." Under Art. 37.071, V.A.C.C.P., the State may introduce evidence "as to any matter that the court deems relevant to sentence," and this

Court recognizes that psychiatric expert opinion testimony regarding a defendant's future dangerousness is such evidence. *Ramirez v. State*, 815 S.W.2d 636 (Tex.Crim. App.1991); *Hogue v. State*, 711 S.W.2d 9 (Tex.Crim.App.1986), *cert. denied*, 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986). Rule 702 requires that the trial judge find that the expert's specialized knowledge, etc. will assist the trier of fact in resolving the issues before them. *Joiner*, 825 S.W.2d at 708. As noted on p. 607, *supra*, the trial court held a hearing outside the jury's presence on Griffith's testimony at which time he overruled appellant's objections thereto. The trial judge thus implicitly found Griffith's testimony to be relevant and helpful to the jury. Appellant's fourth point of error is overruled.

In his fifth point of error, appellant avers the trial judge erred in admitting Griffith's testimony because there was no technical or scientific support in the record for the testimony. As noted in our discussion of the second point of error, Griffith detailed his psychiatric training and experience. He also stated the position of the American Psychiatric Association with regard to predicting a person's propensity for violent behavior. We addressed this same issue in *Joiner* and held that similar testimony satisfied the requisites for the qualification of Griffith. *See* 825 S.W.2d at 708. Appellant's fifth point of error is overruled.

In the sixth point of error, appellant contends the trial judge erred in overruling his challenge to Griffith's qualifications as an expert. Given our resolution of the second and fifth points of error, we find this contention is without merit. The sixth point of error is overruled.

■ In the seventh point of error, appellant asserts the trial court abused it discretion in admitting Griffith's testimony on the second punishment issue because his testimony was based, in part, on out-of-court review of offense reports and witness statements. At the hearing outside the jury's presence,[17] Griffith explained that he had attempted to

tions to express an opinion regarding the second punishment issue.

17. *See* Tex.R.Crim.Evid. 705(b).

examine appellant but was unable to, that he had reviewed the offense reports, witness statements, and photographs pertaining to this capital murder offense, and that he was "acquainted with certain details surrounding [appellant's] past history[.]" The prosecutor then asked Griffith a lengthy hypothetical question based on the evidence presented at trial regarding appellant's propensity for violence.

In the jury's presence, prior to asking Griffith the hypothetical question, the prosecutor stated:

> Doctor, we have spent a considerable amount of time while the jury was out in recess, going over the background of Michael Lee McBride, as well as the events leading up to the double murder occurring here in Lubbock, Texas, involving Michael Lee McBride, Christian Fisher, and James Alan Holzer.
>
> Additionally, you have heard, or I have asked you to assume certain facts in evidence regarding medical testimony, which has been given here in court in this case by Dr. Howard Morgan, McBride's personal physician, and Dr. Garland.[18]

As before, the prosecutor then proposed the hypothetical question asking Griffith to assume certain facts based on testimony during trial. Griffith expressed his opinion that appellant would be a continuing threat to society and that "he will continue to try to commit violent deeds."

■ Appellant argues Griffith's testimony was based in part on inadmissible and "unadmitted" hearsay, i.e., the offense reports and witness statements. Appellant recognizes that the facts relied upon by Griffith need not be admissible in evidence, but he argues the State failed to comply with Rule 703 by failing to show that these facts were "of a type reasonably relied upon by experts in the particular field in forming opinions or infer-

ences upon the subject[.]" Tex.R.Crim.Evid. 703. Rule 703 recognizes that experts rely not only on the facts given them during trial to form their opinions but also on their experience and training. *Ramirez*, 815 S.W.2d at 651. An expert witness may give his opinion as to a defendant's future dangerousness based upon sufficient relevant facts provided those facts are within his personal knowledge, assumed from common or judicial knowledge, or established by the evidence. *Cook v. State*, 858 S.W.2d 467 (Tex.Crim.App. 1993), at p. 474; *Ramirez*, 815 S.W.2d at 650.

■ The hypothetical question was based on facts established by the evidence in this trial. Although Griffith had seen the offense reports and witness statements, no fact set forth in the State's hypothetical referred to these hearsay documents. Thus, none of the facts or data underlying these documents was disclosed before the jury. *See* Rule 705. Based on the facts of the hypothetical question, Griffith expressed his opinion, within reasonable medical probabilities, regarding appellant's propensity for future violent conduct. A hypothetical question is a permissible form for a psychiatrist's testimony on the issue of future dangerousness, so long as the hypothetical is based upon facts in evidence. *Cook*, at p. 474–75; *see also Amos v. State*, 819 S.W.2d 156, 163 (Tex.Crim.App.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1959, 118 L.Ed.2d 561 (1992). Appellant's seventh point of error is overruled.

■ The eighth point of error asserts the trial judge erred in refusing to instruct the jury that it was not to consider Griffith's psychiatric testimony based on the hypothetical question unless it believed each element of the hypothetical was proved beyond a reasonable doubt. Appellant's requested instruction in this regard was denied by the trial court.[19]

---

18. Dr. Morgan was called by the defense to testify during the guilt/innocence portion of this trial. He cared for appellant after his self-inflicted gunshot wound to the head the day of this capital offense. Morgan testified appellant sustained massive damage to his skull in the front part of his head and some brain damage, and had undergone cosmetic surgery. Appellant also lost his sense of smell. Morgan testified the injury did not make appellant more violent than before.

Dr. Garland, a neurological surgeon, was called as a witness by the State during the punishment phase of trial. He testified appellant's head injury did not change his personality.

19. The request for the instruction arose during defense counsel's cross-examination of Griffith:

It is well-established that an expert witness may give testimony based upon a hypothetical question. *Id., citing Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). Although the hypothetical question must be based on facts in evidence, there is no requirement in the rules of criminal evidence that these facts have been proved beyond a reasonable doubt.[20] This Court has long recognized that a trial court may admit, *for whatever value it may have to a jury,* psychiatric testimony concerning the defendant's future behavior at the punishment phase of a capital murder trial. *Barefoot,* 596 S.W.2d at 887, *citing Chambers v. State,* 568 S.W.2d 313 (Tex.Crim.App.1978), *cert. denied,* 474 U.S. 864, 106 S.Ct. 181, 88 L.Ed.2d 150 (1985), and *Moore v. State,* 542 S.W.2d 664 (Tex.Crim.App.1976), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977), (emphasis added). The trier of fact is the judge of the credibility of the facts in evidence and, consequently, the opinion of the expert witness based on these facts. Appellant's eighth point of error is overruled.

In the remaining four points of error, appellant raises issues challenging the constitutionality of Art. 37.071. In the ninth point of error, appellant advances a facial attack and an "as applied" challenge to the constitutionality of § 19.03(a)(6) of the Penal Code as applied through Arts. 37.071(b) and (f).[21] Appellant argues the statutes operate in such a way as to permit the State to prevent the jury from considering the mitigating circumstance of provocation via the third punishment issue.[22] Specifically, appellant contends that since Holzer was the first named victim in the indictment, the State was permitted to prevent the jury from considering the provocation by Fisher, to-wit: that she and appellant were apparently engaged; that she was attempting to end their relationship; that Holzer was staying at her apartment and she would not allow appellant to also stay there; that appellant believed she and Holzer were sleeping together; that she came to appellant's house on the night of the offense not alone as he had asked but with three companions; and that she taunted him when he held the rifle on her in the middle of the street.

"This Court will not decide constitutional issues on a broader basis than the record requires." *Parent v. State,* 621 S.W.2d 796, 797 (Tex.Crim.App.1981) (panel opinion) (challenging constitutionality of sexual abuse of a child statute), and cites therein. Thus, when challenging the constitutionality of a statute, the defendant must show

---

Q (by defense counsel) Okay. Well, which facts in that hypothetical are irrelevant, Doctor?

A (by Griffith) I didn't determine that any of them were irrelevant.

Q So every one of them has got to be proved to be true beyond a reasonable doubt before this jury can rely upon your opinion, isn't that a fact?

[Prosecutor]: Your Honor, that invades the province of the jury, I—

[Defense Counsel]: No, your honor, I think I am entitled to an instruction, and I would like to ask the court—

The Court: I will overrule the objection.

[Defense Counsel]: Sir?

The Court: I overrule his objection.

[Defense Counsel]: Right. But I would ask the court, now, to instruct the jury that unless they find that each fact cited by Mr. Ware, as a fact in the hypothetical, is true beyond a reasonable doubt, they are to disregard the opinion expressed.

The Court: No.

20. Indeed, in propounding the question to the witness, counsel may assume the facts in accordance with his theory of the case. *Barefoot v. State,* 596 S.W.2d 875, 887–88 (Tex.Crim.App. 1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981), *aff'd sub nom., Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

21. Section 19.03(a) provides in pertinent part: A person commits an offense if he commits murder as defined under Section 19.02(a)(2) of this code and: ...

(6) the person murders more than one person:
(A) during the same criminal transaction.
Article 37.071(f) provides:
If a defendant is convicted of an offense under Section 19.03(a)(6), Penal Code, the court shall submit the three issues under Subsection (b) of this article only with regard to the conduct of the defendant in murdering the deceased individual first named in the indictment.

22. Article 37.071(b)(3) asks the jury:

[I]f raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

that in its operation the statute is unconstitutional as to him in his situation; that it may be unconstitutional to others is not sufficient. *Id.* In this cause, the jury was not charged on the third punishment issue as to either victim of this offense, and appellant lodged no objection to that aspect of the charge. Indeed, we find the evidence did not raise the issue of provocation as addressed in the third punishment issue, and hence we do not reach the merits of appellant's contentions in points of error nine and ten.[23]

■■■ In order to raise the issue of provocation there must be evidence of the deceased's conduct just prior to her death. *Hernandez v. State,* 643 S.W.2d 397, 401 (Tex.Crim.App.1982), *cert. denied,* 462 U.S. 1144, 103 S.Ct. 3128, 77 L.Ed.2d 1379 (1983). The only evidence arguably indicative of provocation is Fisher's statements to appellant immediately before he began shooting her. We find, however, these statements insufficient to constitute "provocation" where appellant creates the criminal episode as he did here, initiates the violence, and assaults several unarmed individuals with a deadly weapon. *Cf. Johnson v. State,* 853 S.W.2d 527 (Tex.Crim.App.1992), at pp. 537–38 (trial judge did not err in refusing to charge jury on third punishment issue). *See also* and *cf. First v. State,* 846 S.W.2d 836 (Tex.Crim. App.1992). Appellant's ninth and tenth points of error are overruled.

In his twelfth point of error, appellant contends Art. 37.071 is unconstitutional as applied to him "in that it does not require the sentencer to give independent mitigating weight to aspects of [his] character and record thereby failing to guide and focus the jury's objective consideration of the particularized circumstances of the offense and the offender." Although appellant states his constitutional attack to the statute as applied, he fails to cite in his brief to any such mitigating evidence introduced at his trial and fails · to argue how that evidence was relevant beyond the scope of the punishment issues. We perceive appellant's challenge as a facial attack on the validity of Art. 37.071. This same contention was resolved contrary to appellant's position in *Lewis v. State,* 815 S.W.2d 560, 567 (Tex.Crim.App.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1992); *Johnson,* at p. 535. Appellant's twelfth point of error is overruled.[24]

In his final point of error appellant asserts the Texas death penalty statute violates the Eighth and Fourteenth Amendments to the federal constitution because the probability that one will commit future acts of violence is impossible to predict. This Court has considered this contention many times and has resolved it contrary to appellant's position. *See Joiner v. State,* 825 S.W.2d 701, 709 (Tex.Crim.App.1992). We see no reason to depart from that precedent. The thirteenth point of error is overruled.

Finding no merit in appellant's points of error, we affirm the judgment of the trial court.

CLINTON, J., concurs in the result.

MALONEY, J., concurs in the result reached in POE # 11 and joins the rest of this opinion.

---

**23.** In his brief on these points, appellant twice asserts that our capital punishment scheme allows the State to prevent the jury from considering "deliberateness and provocation in cases of multiple murder[.]" This language, using the terminology from the first and third punishment issues, seems to raise a constitutional question regarding the first issue, too. Appellant, however, limits the arguments in his brief to the third issue. Thus, the question regarding the first issue is inadequately briefed. Tex.R.App.Proc. 74. We note that in *Narvaiz v. State,* 840 S.W.2d 415, 433 (Tex.Crim.App.1992), this Court overruled a similar challenge.

**24.** In his argument supporting his ninth and tenth points of error, appellant asserts "some mitigating evidence was presented to the jury," that being voluntary intoxication at the time of the offense, absence of a criminal record, remorse for his acts, physical abuse as a child (appellant's father testified that he was an alcoholic and that he had physically abused appellant many times), and the (self-inflicted) physical injury he sustained. In accordance therewith, the jury was given instructions that these circumstances "may be considered by [the jury] as extenuating or reducing the degree of moral culpability of the defendant[.]"