

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,327

**DANIEL LOPEZ, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL FROM CAUSE NO. 09-CR-787-B
IN THE 117TH DISTRICT COURT
NUECES COUNTY**

**KEASLER, J., delivered the unanimous opinion of the Court.**

**O P I N I O N**

In March 2010, a jury convicted Daniel Lopez of killing Stuart Alexander, a peace

officer who was acting in the lawful discharge of an official duty.[1]  Pursuant to the jury's

answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071,

---

[1]  TEX. PENAL CODE § 19.03(a)(1).

sections 2(b) and 2(e), the trial judge sentenced Lopez to death.[2] Direct appeal to this Court is automatic.[3] Lopez raises three points of error. After reviewing Lopez's points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

In point of error two, Lopez challenges the legal sufficiency of the evidence to support the jury's affirmative answer to the future dangerousness special issue.[4] We shall address this issue first. The remaining points of error will be addressed in the order presented in the briefs.

When reviewing the legal sufficiency of the evidence to support the jury's answer to the future dangerousness special issue, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed beyond a reasonable doubt there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[5] In its determination of this special issue, the jury is entitled to consider all of the evidence admitted at both the guilt and

---

[2] TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

[3] *Id*. art. 37.071, § 2(h).

[4] *Id*. art. 37.071, § 2(b)(1).

[5] *Williams v. State,* 273 S.W.3d 200, 213 (Tex. Crim. App. 2008); *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

punishment phases of trial.[6] The jury may also consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[7] These factors include, but are not limited to: "(1) the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the crime; (7) psychiatric evidence; and (8) character evidence."[8] The circumstances of the offense and the events surrounding it may be sufficient to sustain an affirmative answer to this special issue.[9]

The State presented evidence at the guilt phase that at the time of the instant offense Lopez was on deferred adjudication probation for indecency with a child. He was living with his brother, Jose Ricardo Lopez (hereinafter referred to as "Jose"), in a residence on Angela Street in Corpus Christi. Jose testified that Lopez thought there was a warrant for his arrest because he had not been complying with the conditions of his probation. Lopez told

---

[6] *Young v. State,* 283 S.W.3d 854, 863 (Tex. Crim. App. 2009).

[7] *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

[8] *Id.*

[9] *Devoe v. State,* 354 S.W.3d 457, 462 (Tex. Crim. App. 2011).

Jose that he would do everything in his power to resist going to jail, and he told his mother, Maria Teresa Quintero, that "he would die before he went back to jail." Jose also testified that Lopez had practiced evasive driving maneuvers and that he did not like people to put their hands on him or tell him what to do.

The day before Alexander's murder, Jose and Lopez were in the process of moving to another residence. Melanie Sky Saldana, who was Lopez's girlfriend at the time, testified that they were moving because Lopez "didn't want his probation officer to find him."

That night, Lopez failed to stop at a stop sign as he was driving through his neighborhood in his Ford Expedition accompanied by Saldana and his ex-girlfriend Ashley Martinez. Officer Stephen Cox of the Corpus Christi Police Department testified that he observed Lopez fail to stop at the stop sign shortly before midnight. Cox activated his overhead lights and followed Lopez. When Cox pulled up to him, Lopez had already parked in front of a house on Angela Street, and Saldana and Martinez exited the Expedition. Lopez, who was standing outside the Expedition, at first paid no attention to Cox and appeared to be "shuffling around with something" inside the car. When Cox aimed his spotlight at him, Lopez turned and glared at Cox and then continued what he was doing. Cox said, "Hey, come here," and Lopez said, "What?" Cox repeated himself and walked toward Lopez, who then started backing away. Thinking that Lopez might attempt to flee, Cox grabbed Lopez by his shirt. Lopez said, "Oh, it's going to be like that?" He then punched Cox and knocked his hand away from his shirt. Cox reached for his Taser and told Lopez

to get on the ground. Lopez said, "Oh, you're going to Tase me, bitch?"

Lopez continued to punch Cox, who tried to use his Taser but failed to make contact with Lopez. Cox tried to use his police radio to call for backup, but Lopez knocked it out of his hand. Cox attempted to use pepper spray, but Lopez turned his head and avoided getting it in his eyes. Lopez then ran back to his Expedition and drove away. Cox pursued Lopez and called for police assistance on his radio. As Cox pursued Lopez through the neighborhood, Lopez drove back past the house where he had previously stopped and "yell[ed] something out the window to some people that were standing out in the front yard." Lopez twice put his Expedition in reverse and attempted to ram Cox's vehicle, causing Cox to drive onto curbs and sidewalks to avoid being hit.

Lopez also attempted to hit Officers Josephine Ressler, Ismael Ybarra, and Martin Jasso when they joined the pursuit. Ressler testified that she first saw Lopez driving toward her at full speed with his headlights off, followed by Cox. Ressler had to sharply pull over to the side of the road to avoid being hit head-on by Lopez. At another point, Lopez put his Expedition in reverse and attempted to ram Ressler's vehicle. As Ressler maneuvered out of the way, Lopez passed her and yelled something out his window.

Ybarra testified that Lopez made a U-turn during the pursuit and drove straight toward him and Cox, causing both of them to swerve out of his way. Ybarra had to drive onto the curb to avoid being hit. They continued to follow Lopez through the residential neighborhood, and Lopez again drove down Angela Street and passed his brother, Jose, who

was standing outside. Jose testified that when Lopez drove by, he tearfully stated, "I don't know what to do, Joey. I'm not going down like this. I don't know what to do . . . I already messed up." Lopez then made another U-turn and drove toward the officers, forcing them to move out of his way. He put his Expedition in reverse, rammed the rear bumper of Ybarra's vehicle, and drove away.

Jasso testified that when he turned onto Angela Street, Lopez drove straight toward him, ran a stop sign, and made a "very specific jerk" in his direction. Jasso had to drive "[a]bout two feet up onto the curb" to avoid being struck by Lopez's Expedition. Lopez also screamed out his window at Jasso as he passed him.

Lopez then exited the residential neighborhood and began driving toward Highway 358, also known as South Padre Island Drive. Officer Robert Cunningham attempted to flatten Lopez's tires by placing "stop sticks" in his path. Lopez swerved around the stop sticks and began traveling north on Highway 358, pursued by Cox and several other officers, including Rene Cruz and Zacharias Johnson. The pursuing officers heard on the radio that Lieutenant Stuart Alexander was deploying stop sticks at "358 and [the] Agnes [exit]." Lopez drove straight down the middle of the highway at a speed of approximately 70 miles per hour. When Lopez approached the Agnes exit, he made a sudden swerve to the right toward Alexander, who was positioned to the side of the well-lit highway. Cruz testified that Lopez struck Alexander with the front right corner of his Expedition, causing Alexander to "fly in the air and roll." Cruz described the collision as "a bullet and a target." Johnson saw

Alexander turn and run before Lopez struck him and sent him "flying through the air towards the grassy area" on the side of the highway. Cox testified that the Expedition kicked up a cloud of dirt before Lopez "immediately corrected his course back onto the freeway and continued going northbound." Officers Ybarra, Javier Cantu, and Jose Lerma, Jr., drove to Alexander's location and observed him lying face-up in the grass approximately 175 feet from the point of impact. Alexander had a weak pulse and extensive injuries, and Ybarra and Cantu unsuccessfully tried to resuscitate him. He was later transported to the hospital and pronounced dead.

After striking Alexander, Lopez continued driving north on Highway 358 until he exited on Leopard Street. Officers testified that at that point, Lopez's right front tire was "completely shredded off" and he was "kicking up sparks." However, Lopez continued to flee and avoided another set of stop sticks in his path. He attempted to enter the "Crosstown Expressway" by driving the wrong direction up the exit ramp, but he was forced to swerve back onto the access road because another vehicle was exiting the expressway.

Shortly thereafter, officers used a "precision immobilization technique," also known as a "PIT maneuver," to stop Lopez. Cruz drove into Lopez's Expedition, causing it to spin 180 degrees, and other officers boxed him in from all angles. Lopez then began ramming the patrol cars that surrounded him while spinning his wheels and revving his engine. Cruz testified that Lopez was using his Expedition as a "battering ram." Lopez struck the patrol car in front of him that was driven by Officer Douglas McDonald. He also struck the patrol

car behind him that contained Officers Israel Carrazco and Pete Muniz, pushing their car onto the grass and within a few feet of a steep embankment above the expressway. Carrazco testified that when he exited his car and drew his gun, Lopez looked directly at him and "immediately gunned it" with his wheels spinning. Carrazco had to jump over the hood of a patrol car to avoid being run over by Lopez. Muniz testified that when he fired his gun at the Expedition and shattered the driver's door window, Lopez looked directly at him and continued to drive in reverse. After Carrazco and Muniz fired at him again, Muniz observed Lopez "hunched over the center console." Lopez, who sustained gunshot wounds to his left arm, neck, and upper chest area, was removed from his Expedition and taken into police custody.

The jury heard evidence of Lopez's interactions with family members during and after the chase. Lopez talked to Jose (his brother), Martinez (his ex-girlfriend), and Quintero (his mother) on his cell phone during the chase. He told Jose and Martinez that he thought he hit a police officer, and he told Quintero that he thought he "ran over somebody." When Quintero later visited Lopez in the hospital, he said, "They tell me I killed somebody" and explained that he "couldn't see" because "they had pepper sprayed him." However, Officer Cox testified that the pepper spray hit Lopez on the side of the head but not in his eyes, and other officers testified that he did not appear to have been affected by pepper spray when he was taken into custody. Officer Richard Garcia testified that he heard Lopez tell Quintero at the hospital that he "tried to stop before [he] hit the officer." Garcia added that there were

no brake lights seen or skid-mark evidence to substantiate that explanation.

Jose Aguayo of the Nueces County Sheriff's Department testified regarding a conversation he had with Lopez while transporting him for medical treatment. Lopez told Aguayo that he needed to let "law enforcement" know that he had cocaine hidden inside a can with a false bottom in the center console of his Expedition. Lopez explained to Aguayo that he "sold drugs just to make ends meet." Officers searched the Expedition at the impound lot and found twelve packets of crack cocaine inside a can and a small scale wedged under the console.

Jailers Freddie Nunez and Mildred Ann Gomez also testified regarding their interactions with Lopez. Nunez testified that in April 2009, when he informed Lopez that his recreation period had ended, Lopez smiled and said, "Do you know who I am?" "I'm the cop killer everyone has been talking about," Lopez explained. Gomez testified that in May 2009, when she was transporting Lopez for medical treatment, the attending physician asked Lopez how long he was going to be in jail. Lopez responded, "A long time." Gomez explained to the doctor that Lopez had been charged with capital murder and would probably be incarcerated "forever." After the doctor left, Lopez started laughing, and Gomez asked him what was so funny. Lopez said "it doesn't make any difference because as cop killers, when we go to T.D.C., we're kings." Gomez asked him what he meant, and he responded that he would receive protection and "extra commissary" and that he would not "want for anything."

While in jail awaiting trial, Lopez wrote a letter to Delfina Vela, the mother of his former girlfriend Jessica Vela. Lopez bragged that when the officer stopped him, he "wuped [sic] his ass." He explained that he "did what [he] did" because he was "already running from [his] P. O." and he had drugs and a gun in his car. He said that he threw the gun out of his car during the police chase, but he was unable to throw out the drugs. He added that he "should be in [the] . . . news paper [sic] saying they found crack in my car."

At the close of the guilt phase, the jury convicted Lopez not only of the instant capital murder, but also nine other offenses: assault on a public servant (Cox); attempted aggravated assault on a public servant (Jasso); the attempted capital murders of Ybarra, Muniz, Carrazco, McDonald, and Cox; evading arrest or detention using a vehicle and causing death; and possession of a controlled substance with intent to deliver.

The jury heard evidence at the punishment phase regarding Lopez's behavior before and after he committed the instant offense. Lopez's high-school physical-education teacher, David Calk, testified that Lopez "had a reputation for consistently getting in trouble" at school. Aurelio Tamayo, who was a teacher and principal at the high school, testified that Lopez had an almost uncontrollable temper at times and consistently failed to follow school rules. Calk testified that Lopez "sprayed perfume through [a] lighter and created a flame" while "surrounded by a bunch of students" in December 2002. Following this incident, Lopez was suspended and sent to the school district's Alternative Education Program ("AEP"). Tamayo testified that Lopez brought a knife with him to AEP in January 2003.

A substitute teacher confiscated the knife, but returned it to him at the end of class. He showed up at his high school campus later that day, which was prohibited during his suspension. Tamayo and another teacher, Melissa Burroughs, saw him in the school parking lot attempting to speak to his girlfriend, fellow student Jessica Vela. When Tamayo and Burroughs instructed Lopez to leave campus, he reached into his pocket and pulled out what appeared to be a folding knife. He "opened it up, closed it back up, put it back in his pocket and left." As he walked away, he called Burroughs a "bitch" and said "you can call the cops if you want to, I can do what I want." Tamayo reported the incident to authorities, and Lopez was thereafter placed in the Juvenile Justice Alternative Education Center.

Tamayo testified that Lopez was sent to AEP again in the fall of 2003 after attacking Vela in the hallway at school. Vela testified that Lopez was jealous because she was talking to another boy, so he "smacked [her] in [her] face and threw [her] books down."

In the spring of 2004, Lopez was sent to the school office after a student reported that Lopez had shown him what appeared to be a bag of marijuana. After Tamayo repeatedly asked Lopez if he had any prohibited items, he responded, "Well, I do, but you're not gonna get it, I'm gonna try to get rid of it." Lopez walked out of the office and toward the closest bathroom. Lopez tried to push Tamayo out of the way when he blocked Lopez from entering the bathroom, so Tamayo and another teacher had to restrain him. Lopez eventually calmed down, returned to the office, and produced a bag containing marijuana. Following this incident, he was again sent to AEP. He was also placed on probation for possession of

marijuana in a drug-free zone. His juvenile-probation officer, Graciela Conklin, testified that Lopez fulfilled some conditions of probation, but he failed to pay all of his required fees and to perform community service.

AEP teacher Adriana Bilano testified that Lopez had been "aggressive with other students" in her classroom over the years. In March 2005, Lopez came to her AEP classroom in an "agitated" state. He kept getting up and "stomping around," and "[a]t times he would mumble and curse and kick things, or shove his chair." Lopez and another boy were taunting and pushing each other, and at one point Lopez threw a glass of water in the other boy's face. Bilano told them to sit down and that she was going to call their referring high school and their guardians to pick them up. When Bilano turned around to pick up the phone, Lopez came up behind her, grabbed the phone and her hand, jerked them back over her head, and detached the cord from the phone. Other students stood up to defend Bilano, and Lopez released her. Bilano called 9-1-1, the high school principal, and the superintendent of the school district. She also pressed assault charges against Lopez.

Vela testified about Lopez's violent behavior during their relationship. Vela and Lopez began dating when they were both fifteen years old. During their four-year relationship, Lopez lived in her family home and fathered two of her children. Vela testified that Lopez "had anger," that he "just doesn't like to be told what to do," and that he was "known not to back down" in confrontational situations. When they had been dating for just a few months, Lopez slapped Vela's face. He also had sex with her younger sister while they

were dating. When Vela refused to discuss this subject with him at school, Lopez punched a fire extinguisher and broke his hand. He choked Vela once when she was pregnant with their son and again when she was pregnant with their daughter because Vela told him she wanted to leave him. On another occasion, Lopez held Vela down on a bed, placed a nail at the tip of her ear, and threatened to push it in her ear, prompting Vela to call the police and have him arrested for assault. Lopez was sentenced to ninety days in jail and a $500 fine, but his sentence was suspended and he was placed on community supervision for a year. However, his community supervision was revoked because he paid little of his fine and court costs, failed to perform community service, failed to attend a batterer's intervention or anger management class, and assaulted a constable.

Vela further testified that when she was nine months pregnant with their daughter, Lopez showed up at her check-up appointment with his new girlfriend, Ashley Martinez. Vela testified that this made her so upset and stressed that her doctor induced labor. Vela testified that their relationship ended after their daughter was born and that Lopez rarely provided financial support for their children.

Ashley Martinez testified that Lopez also attacked her when she was pregnant with their daughter. During an argument at her home, Martinez told Lopez that she wanted to end their relationship and asked him to leave. Lopez tried to push Martinez's five-year-old brother out of her room, and he kept pushing him when Martinez asked him to stop. When Martinez tried to leave the room, Lopez pushed her onto the bed and hit her above her left

eye, which resulted in a "bloody eyebrow." Lopez threatened to continue hitting her if she did not "shut up." At one point when Martinez was standing against the wall in her room, Lopez "punched a hole in the wall right above [her] head." Lopez finally left when Martinez's sister-in-law came to the house and called the police. When Martinez's sister-in-law asked Lopez why he hurt Martinez, he said he did it "because [she] deserved it and because [she] didn't love him anymore." Two days later, Lopez returned to Martinez's house and told her mother that if Martinez pressed charges against him, she was "going to be sorry." He also threatened to kill Martinez and her younger brother. Martinez obtained a protective order against Lopez. Two years later, however, Martinez resumed her relationship with Lopez and had another child with him. Martinez testified that Lopez failed to financially support their children.

Lopez was also abusive with another girlfriend, Ramona Vega, who began dating Lopez in 2006 and had a child with him. Vega described Lopez as a person who would not "let anyone say nothing to him" and who would refuse to back down during a confrontation. Vega testified that once when she "wanted to go out with some friends and he didn't want [her] to go out," Lopez pushed her against a wall and slapped her. While they were dating and living in Texas City, Vega "walked in on" twenty-year-old Lopez having sex with her fifteen-year-old sister, Corina. Vega's older sister reported the incident to police. Lopez gave a statement to Detective Earl Mendenhall in which he admitted that he had sex with Corina on the date in question and on several previous occasions, the first occurring when

she was only fourteen years old. Lopez was placed on six years of deferred adjudication probation for indecency with a child, and he was ordered to attend sex-offender therapy classes as a condition of his probation.

Lopez's probation officer, Lori Lopez (hereinafter referred to as "Lori"), testified that Lopez admitted that he had sex with the victim and he knew she was underage, but said "that he was not a sex offender and he didn't know why he had to comply with all of these things." Lori testified that Lopez had a "nonchalant" attitude and never showed any guilt or remorse for his offense. Lopez went to some of the sex offender therapy classes, but he told Lori that he did not want to be there and that he did not like it. Lopez also failed to report to Lori as required. In the two-and-a-half months that she supervised his probation, Lopez missed two of his six appointments with her. She did not file a motion to revoke his probation, however, until after she learned about his commission of the instant offense.

At the time he committed the instant offense, Lopez was dating sixteen-year-old Melanie Sky Saldana. Saldana testified that she met Lopez in February 2009 and that he was aware of her age. She testified that she ran away from home while they were dating and stayed with Lopez at his house. She further testified that she had sexual intercourse with Lopez around ten times during this time period.

Following his arrest for the instant offense, Lopez wrote to Delfina Vela, the mother of his former girlfriend Jessica Vela, about his current and prior offenses and his conduct while in jail. He explained that he was classified as a sex offender because the underage

victim was a "hoe" and "came on" to him. He admitted that while he was in jail he "beat up a jailer," had gang writings on his cell walls, and possessed a handcuff key, needles, and razors. He informed Delfina that he would have several children with numerous different women by the end of the year. He stated that he wanted the death penalty because after his death each of his children would receive welfare benefits until the age of eighteen.

Lopez had an altercation with corrections officer Juan Rodriguez in the county jail on December 5, 2009. Rodriguez checked on Lopez when he heard him banging on his cell, and Lopez told him he wanted to speak with the sergeant on duty because he wanted to be moved back to "maximum security." Rodriguez notified the sergeant, who was busy at that time. Lopez later continued kicking his cell door and repeated his request, and Rodriguez told Lopez he would notify the sergeant again. Lopez later called Rodriguez back to his cell, repeated his request, and asked for a roll of toilet paper. When Rodriguez went into his cell to hand him the toilet paper, Lopez attempted to tackle and move past him. Rodriguez radioed for help, and he and other officers subdued Lopez. Rodriguez testified that he "jammed [his] right wrist," had a "couple of scratches," and that his "ribs were tender for the next couple of days" after the incident.

Later that month, jailer Freddy Nunez noticed that Lopez was not wearing "county approved" shoes. Upon inspection, Nunez found a paper clip that was fashioned into a handcuff key hidden underneath the insole of Lopez's right shoe. Lopez smiled and said, "It's my handcuff key. How else do you think I'm gonna get out of court[?]"

Assistant Chief Deputy Mike McKenzie testified that when he and other officers searched Lopez's cell on December 30, 2009, they found a stick pin inside a bar of soap. Another officer testified that Lopez had written his own name on his cell wall, along with the words "killa" and "fuck the police." McKenzie testified that when Lopez was informed that he could lose visitation privileges as a result of his actions, Lopez said he would give the officers "other things that [they] might be interested in." Lopez then produced another bar of soap with a pin in it and a razor blade that was taped to his legal paperwork. He admitted that he had been in possession of the razor blade since the time he had been in the jail's medical unit.

Lopez argues on direct appeal that the evidence of future dangerousness was insufficient for a variety of reasons. He contends that he was "acting alone," that he "had access to a firearm, but did not use it," and that his conduct was "impulsive," was "not characterized by forethought or deliberateness," and was "provoked in part by the police." However, the evidence viewed in the light most favorable to the verdict shows that Lopez believed there was a warrant for his arrest and that he told his brother and his mother that he would do anything, even die, to avoid going to jail. Lopez followed through with these statements when Officer Cox merely stopped him for running a stop sign. Although Lopez did not use his firearm during the chase, he used his Expedition to inflict damage and harm the responding officers. Officer Cruz testified that Lopez used his Expedition as a "battering ram" and compared it to a "bullet" hitting a "target" when he struck Alexander with it. Not

only did Lopez strike and kill Alexander, he also physically assaulted Cox, fled from police, and either hit or attempted to hit numerous other officers with his vehicle.

Lopez also asserts that he has never been previously convicted of a "crime of violence," that his "unadjudicated assaultive acts involved family relationships and not strangers," and that he never used a weapon or caused serious bodily injury to anyone prior to the instant offense. He further contends that there was "no psychological evidence to support a finding of future dangerousness," and that no one testified that he had "a bad reputation in the community for being a peaceful and law abiding citizen." Contrary to Lopez's assertions, one high school teacher testified that Lopez "had a reputation for consistently getting in trouble" at school, and another testified that Lopez was "aggressive with other students" in her classroom over the years. Other witnesses testified that Lopez pulled out a knife when teachers told him to leave campus and that he physically attacked his girlfriend at school and a teacher in his AEP classroom. He hit and choked multiple girlfriends, sometimes while they were pregnant. His sister, Maria Guadalupe Lopez, testified that Lopez has "anger problems" and acknowledged that he threw chairs at teachers and gave their mother a "bloody lip" when he was a child. Others described him as a defiant and angry person who did not back down from confrontations and did not like being told what to do. The evidence also showed that he failed to comply with the conditions of probation and demonstrated no remorse for his actions.

Lopez's behavior after the instant offense provided further evidence of future

dangerousness. He bragged about being a "cop killer" who would be treated as a king in prison. He attacked a jailer and possessed contraband including a makeshift handcuff key, stick pins, and a razor blade. The evidence, viewed in the light most favorable to the verdict, was sufficient to support the jury's affirmative answer to the future dangerousness special issue. Point of error two is overruled.

In point of error one, Lopez argues that the Texas death penalty statute violates the Eighth and Fourteenth Amendments to the United States Constitution. In support of this argument, he points to the objection he made at trial:

> In addition, we ask the Court to rule that the death penalty is unconstitutional pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the U. S. Constitution on the grounds that it is virtually impossible to predict future dangerousness, and the unreliability of such a prediction for future conduct makes the imposition of the death penalty based on such indefinite and uncertainty [sic] a violation of due process. And for that reason, we would ask that the Court withdraw the capital murder charge from the jury and sentence the Defendant to life without parole.

This Court has previously rejected the argument that the Texas death penalty statute is unconstitutional because no one can reliably predict whether a person will commit future acts of violence.[10] We decline to revisit the issue in this case.

Lopez further argues on appeal that the Texas death penalty statute is unconstitutional because of the "inevitable possibility" of convicting and executing innocent people. Lopez failed to preserve this particular claim for review because his trial objection does not comport

---

[10] *Coble v. State*, 330 S.W.3d 253, 297-98 (Tex. Crim. App. 2010), *cert. denied,* 131 S. Ct. 3030 (2011); *McBride v. State*, 862 S.W.2d 600, 611 (Tex. Crim. App. 1993); *Joiner v. State*, 825 S.W.2d 701, 709 (Tex. Crim. App. 1992).

with his argument on appeal.[11]  Point of error one is overruled.

In point of error three, Lopez asserts that the State committed prosecutorial misconduct by making an improper closing argument at the guilt phase of trial.  Proper jury argument falls into one of four areas:  (1) a summation of the evidence; (2) a reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement.[12]

Lopez specifically complains that the following argument was prejudicial and outside the record:

> And people are counting on you guys.  Vicky Alexander, the widow, and Stuart Alexander's son, and their family, and the citizens of Corpus Christi, the media is here, everyone is counting on you-all to make the right decision, to do the right thing and to hold that man responsible for the cowardly acts that he under took [sic] on March 11, 2009.  And that's what we're asking you to do.  But I'll tell you, it's not that difficult.

Lopez, however, failed to object and therefore failed to preserve his prosecutorial misconduct claim for our review.[13]

Lopez further asserts that defense counsel rendered ineffective assistance by failing to object to the prosecutor's improper argument.  While the complained-of argument was

---

[11]  TEX. R. APP. P. 33.1.

[12]  *Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000).

[13]  TEX. R. APP. P. 33.1.

arguably a permissible plea for law enforcement,[14] we need not address that issue at this time because "[d]irect appeal is usually an inadequate vehicle for raising [ineffective assistance] claims because the record is generally undeveloped."[15] The record is silent as to why defense counsel did not object to this portion of the State's closing argument. Finally, Lopez contends that the prosecutor's misconduct "was so egregious that the trial court had a duty to intervene *sua sponte* and instruct the jury to disregard the statement or declare a mistrial." Lopez fails to cite any authority supporting this contention and fails to articulate a legal argument why a *sua sponte* instruction was required. Because this issue is inadequately briefed, we decline to consider it.[16] Point of error three is overruled.

We affirm the trial court's judgment.

---

[14] *See Freeman v. State,* 340 S.W.3d 717, 729-30 (Tex. Crim. App. 2011) (upholding State's argument that defendant should receive a death sentence because relatives of police officers murdered in the line of duty "need to also know that we appreciate the sacrifice that they make every day of their life"), *cert. denied*, 132 S. Ct. 1099 (2012); *Martinez v. State,* 17 S.W.3d 677, 692 (Tex. Crim. App. 2000) (holding that the State's argument that the "family of the murdered victims" and "the victims themselves . . . cry out to you, for the death penalty in this case" was arguably a justifiable plea for law enforcement); *Whittington v. State*, 580 S.W.2d 845, 847 (Tex. Crim. App. 1979) (holding that the State's argument that the jurors should think about the fact that they would "want to give [neighbors] an answer [they] [could] be proud of, that [their] friends and neighbors [could] be proud of" was a legitimate plea for law enforcement).

[15] *Menefield v. State*, 363 S.W.3d 591, 592-93 (Tex. Crim. App. 2012).

[16] *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008).

DELIVERED: October 31, 2012

DO NOT PUBLISH