

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,175

### CHRISTIAN OLSEN, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 07-04601-CRF-361
### IN THE 361ST JUDICIAL DISTRICT COURT
### BRAZOS COUNTY

**KEASLER, J., delivered the opinion of the Court in which PRICE, WOMACK, JOHNSON, HERVEY, COCHRAN, and ALCALA, JJ., joined. KELLER, P.J., filed a concurring opinion. MEYERS, J., dissented.**

### O P I N I O N

In February 2009, a jury convicted Christian Olsen of capital murder.[1] Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced Olsen to death.[2] Direct appeal to

---

[1] TEX. PENAL CODE § 19.03(a)(2).

[2] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(g) (requiring a trial judge to sentence a defendant to death upon a jury's affirmative findings of issues under subsection 2(b) and

this Court is automatic.[3]  We affirm the judgment of guilt, but we reverse Olsen's sentence and remand the case to the trial court for a new punishment hearing.

## I. BACKGROUND

At noon on June 3, 2007, Etta Jean Westbrook left church services and went to her home in Bryan, Texas.  Around midnight, Hazel Ogden, Westbrook's best friend, received a phone call from Westbrook's alarm company, alerting her that an alarm went off in Westbrook's home.  Ogden waited for the police to meet her at Westbrook's house.  The responding officer believed that the house was secure, but Ogden insisted that something was wrong because both of Westbrook's vehicles were in the driveway and a light was on inside the house.  Looking through the kitchen window, Ogden was able to see raw chicken sitting on the counter and convinced the officer that this was something that "[Westbrook] wouldn't do."  They opened the back door, which was unlocked, and found Westbrook's body lying on the living room floor.

According to Ogden, Westbrook's hair was "wet," and there was a large wet spot on the carpeted floor.  The responding officer observed that Westbrook's hair was matted with blood and that there was a large laceration on her forehead.  Although it did not appear that there was any blood at the scene, later tests for latent blood indicated that blood had been cleaned up from the area where Westbrook's body was found.  There were cleaning products,

a negative finding of the issue under subsection 2(e)).

[3] *Id*. at § 2(h).

including bleach, on Westbrook's back porch.

Several hours later, Westbrook's son, Curtis, accompanied officers through the house to determine whether anything was missing. Curtis told them that credit cards and cash were missing from his mother's purse, which should not have been in the guest room where it was found. Westbrook's other son, Randy, told the police that a railroad spike used for keeping a kiln propped open was missing from his mother's garage.

Detective Steven Fry of the Bryan Police Department learned that Westbrook's credit cards had been fraudulently used after her death. Records of her two credit card accounts confirmed that the cards had been used several times after her death. Fry obtained surveillance videos corresponding to most of the fraudulent transactions, which occurred between approximately 2:00 p.m. and 8:15 p.m. on June 3, 2007. On the videos, investigators saw Olsen, sometimes in the company of Kelly Sifuentez, using Westbrook's credit cards at H.E.B., Target, and Wal-Mart in Bryan and College Station. The fraudulent transactions totaled less than $1,500.

The police obtained a warrant for Olsen's arrest and took him into custody at his and Kelly Sifuentez's residence, which was located across the street from Westbrook's home. Olsen admitted to the police that he used the ruse of returning a borrowed baking pan to enter Westbrook's home. He stated that he struck Westbrook in the head with a "piece of metal" from her garage, causing her death. The evidence showed that Westbrook sustained twenty-five blows to the head and had been strangled. After murdering Westbrook, Olsen took her

credits cards and hid her purse in a spare bedroom. Olsen also told the police that he cut himself during the commission of the offense and had cleaned up in the bathroom. A DNA analysis identified Olsen as the source of blood found in Westbrook's sink.

Olsen told the police that he discarded the weapon, the clothes that he was wearing during the offense, and Westbrook's wallet. The police were unable to find the weapon, even after searching the local landfill. The wallet, however, was given to the police by Sifuentez's sister. It contained Westbrook's credit cards and family photos.

The State charged Olsen with capital murder and notified him of its intent to seek the death penalty. Following his conviction and sentencing, Olsen filed a notice of appeal. He requests a new trial because the trial judge erroneously denied a lesser-included-offense instruction on murder. He presents forty-four other issues and requests that we either render a sentence of life imprisonment or reverse his sentence and remand for a new trial on punishment.

Because we sustain issues fifteen and sixteen and remand for a new punishment hearing, we need not address all of Olsen's issues. However, we proceed to address several of his other the issues that are either dispositive or are likely to recur on remand.[4] We begin with the only issue that Olsen presents regarding the guilt-innocence phase.

---

[4] *See McCarthy v. State*, 65 S.W.3d 47, 56 n.8 (Tex. Crim. App. 2001) ("Because we reverse the judgment on the basis of *Edwards* error, the other issues appellant raises are moot."); *Moore v. State*, 969 S.W.2d 4, 6 (Tex. Crim. App. 1998) ("The five remaining points of error are unlikely to recur on remand, and we shall not address them.").

## II. MURDER INSTRUCTION

In issue six, Olsen asserts that the trial judge committed harmful error by denying his timely request to submit a lesser-included-offense instruction on murder. Specifically, Olsen claims that the jury could have rationally found that he lacked the intent-to-kill, a requirement of capital murder under Penal Code Section 19.03(a)(2), and only knowingly killed Westbrook.[5] Olsen argues that the error was harmful and requests that we reverse his conviction and remand for a new trial.

We apply a two-step analysis in determining whether a trial judge erred in refusing a request for a lesser-included-offense instruction.[6] "The first step is to decide whether the offense is actually a lesser-included offense of the offense charged."[7] Because we have already held that "[m]urder is a lesser-included offense of capital murder,"[8] we proceed to the second step.

The second step is to determine whether the record contains some evidence permitting

---

[5] *See Demouchette v. State*, 731 S.W.2d 75, 80 (Tex. Crim. App. 1986) ("The phrase 'intentionally commits the murder' in Sec[tion] 19.03(a)(2) makes 'intentional' (Sec[tion] 6.03(a)) the culpable mental state necessary for conviction of capital murder under 19.03(a)(2), and excludes the possibility of a 'knowing' capital murder under 19.03(a)(2).").

[6] *Feldman v. State*, 71 S.W.3d 738, 750 (2002) (citing *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985); *Royster v. State*, 622 S.W.2d 442, 444 (Tex. Crim. App. 1981)).

[7] *Id*.

[8] *Id*. (citing *Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000); *Moore v. State*, 969 S.W.2d 4, 12 (Tex. Crim. App. 1998)).

"a rational jury to find that the defendant is guilty *only* of the lesser offense."[9] A capital defendant is entitled to a lesser-included-offense instruction on murder only if there is some evidence from which a rational jury could acquit the defendant of capital murder while convicting him of murder.[10] "[I]t is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense . . . ."[11] There must be affirmative evidence directly germane to the existence of the lesser-included offense.[12] "We review all of the evidence presented at trial,"[13] but we may not consider "[t]he credibility of the evidence and whether it conflicts with other evidence or is controverted."[14] The evidence must establish murder as a valid rational alternative to capital murder.[15]

A person commits capital murder if he, with the intent-to-kill, commits a murder in the course of committing or attempting to commit a robbery.[16] A person commits murder if he causes the death of an individual either intentionally or knowingly.[17] "A person acts

---

[9] *Id*. (emphasis in original).

[10] *Id*.

[11] *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997).

[12] *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003).

[13] *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993).

[14] *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994).

[15] *Feldman*, 71 S.W.3d at 750.

[16] TEX. PENAL CODE § 19.03(a)(2).

[17] *Id*. § 19.02(b)(1).

intentionally . . . with respect . . . to a result of his conduct when it is his conscious objective or desire to . . . cause the result."[18] "A person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."[19] Therefore, to be entitled to a lesser-included-offense instruction on murder, Olsen must show that there is some affirmative evidence from which a jury could rationally find that he lacked the intent to kill Westbrook and only knowingly caused her death.[20]

Olsen argues that the evidence from which the jury could have rationally found that he lacked the intent-to-kill is the medical examiner's testimony that: (1) "most of the skull fractures came from one particular blow"; (2) the injury to Westbrook's neck theoretically could have been caused by one blow rather than strangulation; and (3) there were no petechiae in Westbrook's eyes, and petechiae is normally observed in strangulation cases.

But a complete review of the record[21] reflects the following: Olsen used the ruse of returning a borrowed baking pan to enter Westbrook's home. Westbrook regularly kept two railroad spikes in her garage; after her murder, only one remained. Olsen admitted in his

---

[18] *Id.* § 6.03(a).

[19] *Id.* § 6.03(b).

[20] *See id.* § 19.03(a)(2); *Feldman*, 71 S.W.3d at 750; *see also Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (applying section 6.03's definitions of culpable mental states to murder); *Penry v. State*, 903 S.W.2d 715, 742 (Tex. Crim. App. 1995) (applying section 6.03's definition of intent to capital murder).

[21] *See Rousseau*, 855 S.W.2d at 673 (noting the requirement that we "review all of the evidence presented at trial").

statement to police that he struck Westbrook with "[s]ome piece of metal" that he found in her garage, and then stole her credit cards, and hid her purse in a spare bedroom. Westbrook suffered at least twenty-five different and significant blows to her head. Olsen then cleaned the scene, and cleaned up blood near Westbrook's body. Finally, he cleaned himself in Westbrook's bathroom before leaving her house.

In addition to the medical examiner's testimony to which Olsen refers, the medical examiner also testified that Westbrook died as a result of blunt force trauma to the head and strangulation. Her skull suffered "extensive fracturing," including one fracture that extended around the entirety of her skull. She had defensive wounds to her hands, wrists, and forearms. Her eyes were swollen shut, and she had lacerations on her forehead, scrapes and bruises to her face, and bruising on her neck. The autopsy also revealed sufficient strangulation to have cracked the bones of her voice box.

None of these circumstances would permit a jury to rationally conclude that Olsen lacked the intent to kill Westbrook.[22] Thus, the evidence does not establish murder as a valid rational alternative to capital murder.[23] Therefore, we overrule Olsen's sixth issue.

### III. DR. VANDIVER'S TESTIMONY

In issues fifteen and sixteen, Olsen argues that the trial judge abused his discretion and violated his rights under the Sixth, Eighth, and Fourteenth Amendments by ruling that Dr.

---

[22] *See Tompkins v. State*, 774 S.W.2d 195, 210–12 (Tex. Crim. App. 1987).

[23] *See Feldman*, 71 S.W.3d at 750.

Donna Vandiver was not qualified to provide expert testimony about female sex offenders and grooming. The record indicates that Olsen intended to argue at the punishment phase that he was the victim of a female sex offender, Kelly Sifuentez, and that her negative influence over him through "grooming" was a mitigating circumstance and relevant to future dangerousness. He requests a new punishment hearing, arguing that this constitutional error was harmful.

## A. Background

During voir dire examination, Dr. Vandiver stated the following: she is an associate professor at Texas State University and has taught criminal justice classes there for two years. She was previously an assistant professor at Illinois State University for five years and taught the same curriculum. She received her Ph.D. in criminal justice from Sam Houston State University in 2002 and has an undergraduate degree in psychology. She had been a counselor for five years at two mental health centers but was not a qualified psychologist. As a counselor, she became familiar with clinical depression because many of her clients suffered from it.

Dr. Vandiver stated that although she did not interview Sifuentez, she received information about Sifuentez, Olsen, and their relationship from Olsen's mother, Sifuentez's medical records, and reading Sifuentez's and Olsen's romantic letters to each other. From her review of this information, Dr. Vandiver also learned that Sifuentez suffered from depression, would host and supervise get-togethers that Olsen would sometimes attend and

her own daughter would not, would bring Olsen food late at night, bought him a cell phone, and let Olsen live with her after he turned eighteen. Dr. Vandiver also learned that Sifuentez's husband was incarcerated a few years before Olsen moved in with her. was separated from her husband when he was incarcerated.

Dr. Vandiver stated that she would not render any psychological opinion regarding Sifuentez, but instead planned to answer hypothetical questions. More specifically, she would testify whether Sifuentez's characteristics and interactions with Olsen were consistent with a female sex offender who was grooming her victim.

Dr. Vandiver also discussed the characteristics of female sex offenders. She stated that they are typically in their thirties or forties and usually have some position of authority and history of depression. Female sex offenders typically groom their victims. They view the grooming as mutually beneficial rather than harmful. Usually, some sort of life stressor, such as losing a job, will cause a female sex offender to initiate a relationship with the victim.

The prosecution objected to Dr. Vandiver's testimony on several grounds: including that she was not qualified to interpret psychological and psychiatric records; there was insufficient evidence that Sifuentez was a sex offender; Dr. Vandiver's testimony would not be on a proper subject for expert testimony; and her testimony would confuse the jury. To support its objection to exclude Dr. Vandiver's testimony because she was not qualified, the State had her repeatedly admit that she was not qualified to interpret Sifuentez's psychological or psychiatric records or to diagnose Sifuentez with depression.

The trial judge excluded Dr. Vandiver's testimony, explaining that he believed the

State's objection was well-grounded "[b]ased on *Daubert*." However, voir dire was reopened to permit Dr. Vandiver to respond to sample hypothetical questions the defense intended to ask. Dr. Vandiver further explained the techniques of female sex offenders. She stated that grooming can include finding out what a child wants and providing it to him, such as a car ride somewhere or bringing him his favorite food. It can start out with something very small and evolve into bigger things that the victim may want. Grooming is very systematic and occurs over a long period of time.

Dr. Vandiver stated that the more damaging part of the relationship is the grooming, not the sex act, because grooming drives a wedge between the victim and his family, school, church, and peer groups that he usually associates with. The grooming continues regardless of whether there is a sex act, and victims can be groomed for several years before the relationship becomes sexual. She stated that a hypothetical fifteen-year-old who suddenly started becoming truant, running away from home, stealing from his parents, and becoming very secretive would be exhibiting characteristics consistent with a victim of grooming.

After the continued voir dire examination, the trial judge did not change the ruling. He stated:

> My ruling is based upon the fact that I don't believe she qualifies under [Rule] 702 to render the opinion that she's going to render, because I do think it's more of a psychological opinion. I will let you make your record.

> I am also making this ruling based upon the fact that the jury does already have abundant evidence from which they can potentially draw a conclusion that this man was in a relationship with an older woman and that she had expressed an interest in seeing her mother dead, and I think they're arguing to the jury

mitigating circumstances for this particular individual.

> Were it not for all of that information, my decision would be harder, but I still think everything in the context that it is, it's a very, very difficult decision, but I think my decision is going to stay the same.

In a bill of exception, Dr. Vandiver restated her educational and research background. She added, however, that her Ph.D. dissertation was on the subject of female sex offenders. She studied 471 adult women and 61 juvenile female sex offenders and developed a typology. Specifically, she identified two types of female sex offenders: the co-offender and the nurturer, the nurturer being more common. The nurturer is usually in her thirties or forties, and her victim is usually a teenage male. Typically, the nurturer has some sort of history of depression and position of authority or trust with the victim, such as a teacher, supervisor, caretaker, or someone with oversight of the child.

Dr. Vandiver explained that the nurturer grooms the victim and described grooming as a "systematic process where the sole goal is to gain access to the child for inappropriate sexual behavior." Sometimes the child can be groomed quickly, but other times it can take years. Examples of grooming include buying the child a gift, befriending him, and condoning his behaviors that others disapprove of. Secrecy plays a large part in grooming by enhancing the offender's control over the victim. This control is used to drive a wedge between the victim and his friends and family. The offender may also buy gifts or offer alcohol or drugs to the victim to entice him to stay with her instead of spending time with his friends and family.

When the sexual abuse begins, the victim, Dr. Vandiver explained, will suffer several negative consequences such as low self-esteem, which is then externalized through troublesome behavior such as stealing, problems at school, and running away from home. This tends to give the offender more control over the child. The victim will usually withdraw from his activities and other relationships because he will lose interest. The victim sometimes will not "age out" of being controlled after turning seventeen or eighteen, and the female will continue grooming the victim as a matter of habit.

Another researcher reexamined Dr. Vandiver's typology, observed a similar typology, and concluded that Dr. Vandiver's methods were "fairly robust." After Dr. Vandiver published her dissertation, she published five additional works on female sex offenders and had researched female sex offenders for about ten years total.

Dr. Vandiver also discussed the history of how sexual offenses were treated and viewed by society in the first half of the twentieth century. She explained that female rape victims were often blamed as the instigator, but she also explained how that view and views about date rape have changed. She also discussed research regarding male children who have been sexually abused by females. Research shows that male victims will typically deny being a victim, even when asked, and that agencies need to have better policies to deal with male victims. Dr. Vandiver discussed research by a social worker about gender bias in agency response. The research revealed that some practitioners minimized the severity of sexual abuse of boys, laughed at it, and said, "Well, if it's a boy, he probably wanted to have sex."

Many agencies did not have forms for male victims to fill out.

Following the bill of exception, the trial judge stated that the ruling would remain the same. Olsen then made objections grounded in the state and federal constitutions, the rules of evidence, and Article 37.071, arguing that Dr. Vandiver's testimony was relevant to both mitigation and future dangerousness. The trial judge overruled these objections.

## B. Error Analysis

The Texas Rules of Evidence set out three separate conditions regarding the admissibility of expert testimony. First, Rule 104(a) requires a trial judge to determine "[p]reliminary questions concerning the qualification of a person to be a witness."[24] Second, Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."[25] And third, Rule 401 renders relevant evidence admissible, and Rule 402 defines "relevant evidence" as "having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[26]

These rules require a trial judge to make three separate inquiries, all of which must

---

[24] TEX. R. EVID. 104(a).

[25] TEX. R. EVID. 702.

[26] TEX. R. EVID. 401, 402.

be met before admitting expert testimony: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case."[27]  These inquiries are commonly referred to as qualification, reliability, and relevance, respectively.[28]

We review a trial judge's ruling regarding an expert's qualifications and the admissibility of expert testimony for an abuse of discretion.[29]  We "must uphold the trial court's ruling if it was within the zone of reasonable disagreement."[30]  Even when the trial judge gives the wrong reason for his decision, we will sustain the ruling if it is correct on any theory of law applicable to the case.[31]

We begin our analysis with whether the trial judge's exclusion of Dr. Vandiver's testimony based on her lack of qualifications to render a psychological opinion was within the zone of reasonable disagreement.[32]

*1. Qualification*

---

[27]  *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006).

[28]  *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).

[29]  *Lagrone v. State*, 942 S.W.2d 602, 616 (Tex. Crim. App. 1997).

[30]  *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

[31]  *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002) (citing *Moreno v. State*, 341 S.W.2d 455, 456, 170 Tex. Crim. 410, 411 (Tex. Crim. App. 1961)).

[32]  *See Weatherred*, 15 S.W.3d at 542.

"The question of whether a witness offered as an expert possesses the required qualifications rests largely in the trial court's discretion. Absent a clear abuse of that discretion, the trial court's decision to admit or exclude testimony will not be disturbed."[33] A witness's qualification to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things.[34] "Through interviews, case studies, and statistical research, a person may acquire superior knowledge concerning the behavior of offenders" who sexually victimize children.[35] Several courts, including this one, have upheld the admission of expert testimony about grooming from social workers, agents of law enforcement, and counselors.[36] Similarly, a proffered expert who is not a psychologist or psychiatrist may nevertheless be qualified to testify about the effects of sexual abuse on a child victim's behavior.[37]

The following evidence, considered together, establishes that Dr. Vandiver was a

---

[33] *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000).

[34] *Id.*

[35] *See Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999) ("[T]o the extent *Nenno* decides Article 38.22, Section 6, applies only to custodial statements.").

[36] *Morris v. State*, ___ S.W.3d ___, 2011 Tex. Crim. App. LEXIS 1664, at *42 n.64 & 53 (Tex. Crim. App. Dec. 7, 2011) (citing case examples).

[37] *See, e.g., Duckett v. State*, 797 S.W.2d 906, 920 (Tex. Crim. App. 1990) (considering a social worker who had worked many cases involving child sexual abuse to be an expert in the field of child sexual abuse who could testify to help the jury understand why the victim changed her testimony and appeared confused), *disapproved on other grounds by Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993).

qualified expert in the area of female sex offenders and grooming. She had advanced degrees in criminal justice, including a Ph.D. She was an associate professor and had taught university-level courses on criminological theory and current issues, sex offenders, and research methods for seven years. Dr. Vandiver also worked for five years as a counselor at two mental health centers and was familiar with other published research in the field and the pertinent conclusions resulting from those studies.

The trial judge was persuaded by the State's argument and excluded Dr. Vandiver's testimony because it was "more of a psychological opinion." This basis for excluding her testimony is not supported by the record or the law. In *Morris v. State*, we determined that to testify about grooming, an expert witness need not be a qualified psychiatrist or psychologist, so long as the witness has some other basis of expertise.[38] The expert witness in *Morris* did not purport to testify as a psychologist.[39] We reached the same conclusion on similar facts in *Nenno* where we determined that a witness, although not a psychologist or psychiatrist, gained sufficient expertise through his research.[40]

Here, Dr. Vandiver never purported to testify as a psychologist or to diagnose Sifuentez. Dr. Vandiver read Sifuentez's psychological records and took the psychological

---

[38] *See Morris*, 2011 Tex. Crim. App. LEXIS 1664, at *59 & n.109 (recognizing that a person may become an expert through experience independent of having a degree in psychology or psychiatry).

[39] *Id.*

[40] *See* 970 S.W.2d at 552, 561–62 (recognizing expertise based on an expert's research, even though the expert was not a psychologist or psychiatrist).

conclusions contained therein—for example, that Sifuentez suffered from depression—at face value. She explained that Sifuentez's depression was only one of several characteristics of grooming, and that she did not even need to rely on those records to testify. Although Dr. Vandiver admitted that she was not qualified to diagnose someone with depression, she knew what depression meant from her work as a counselor to patients who suffered from major depression. Moreover, her responses to hypothetical questions confirmed that she would not interpret psychological or psychiatric records, or render a psychological opinion.

Because the record in this case establishes that Dr. Vandiver qualified as an expert on grooming and female sex offenders through her research and experience,[41] the trial judge's decision to exclude Dr. Vandiver's testimony because she was not qualified to render a psychological opinion was outside of the zone of reasonable disagreement.[42] However, we proceed to address the admissibility of Dr. Vandiver's testimony more broadly to consider whether the record supports any other theory upon which we should sustain the trial judge's ruling.[43] We therefore turn to whether Dr. Vandiver's testimony was reliable.

*2. Reliability*

For assessing the reliability of expert testimony, we analyze the admissibility of expert testimony on the subject of grooming under *Nenno*'s framework concerning fields of study

---

[41] *See Morris*, 2011 Tex. Crim. App. LEXIS 1664, at \*23 & n.39, \*53–58.

[42] *See Weatherred*, 15 S.W.3d at 542.

[43] *See Osbourn*, 92 S.W.3d at 538.

outside the hard sciences.[44] The *Nenno* framework consists of three questions: (1) whether the field of expertise is a legitimate one; (2) whether the subject matter of the testimony is within the scope of that field; and (3) whether the testimony properly relies upon or utilizes the principles involved in the field.[45] We now turn to analyzing these three questions.

In *Morris*, we answered the first two questions regarding grooming in the affirmative.[46] Thus, we need to consider only the third inquiry under *Nenno*, which is whether the expert's testimony properly relied upon or utilized the principles involved in the field.[47] In answering this question, we consider not only our previous discussion of Dr. Vandiver's qualifications, but also whether she sufficiently articulated the specific principles underlying her expected testimony.[48]

Dr. Vandiver articulated the following underlying principles regarding female sex

---

[44] *E.g.*, *Morris*, 2011 Tex. Crim. App. LEXIS 1664, at *14–19.

[45] *Id.* at *14 (citing *Nenno*, 970 S.W.2d at 560).

[46] *Id.* at *19, *58.

[47] *See id.* at *14–15 (citing *Nenno*, 970 S.W.2d at 561); *see also Tillman v. State*, 354 S.W.3d 425, 436 (Tex. Crim. App. 2011).

[48] *See, e.g.*, *Tillman*, 354 S.W.3d at 437–38 (discussing, as part of *Nenno*'s third inquiry, the expert witness's qualifications and whether he sufficiently articulated the underlying principles and described his rationale when applying his knowledge to hypothetical scenarios); *Nenno*, 970 S.W.2d at 560 (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992), and noting that one factor relating to the determination of reliability is the experience and skill of the person applying the technique); *id.* at 561–62 (describing an expert witness's qualifications and methodology together in ascertaining the reliability of his testimony); *cf. Vela*, 209 S.W.3d at 131 (distinguishing qualification from reliability and relevance).

offenders and grooming. Grooming is a systematic process that can develop rapidly or take a long period of time. Sometimes grooming occurs years before the first sex act. The offender is usually thirty to forty years old and has a history of depression. A major life stressor can prompt her to initiate a relationship with the child. She ordinarily assumes a role as a trusted adult in the child's life, usually by obtaining a position of authority over the child. She discovers what the child wants in order to provide it to him. Examples can range from getting him his favorite food to buying him a cell phone. The goal of grooming is to gain control over the victim by developing an exclusive relationship and to drive a wedge between him and his family and friends. The victim does not "age out" of the cycle of grooming just because he turns seventeen, even though a sexual relationship would not be illegal at that point. The offender will continue acting as she had done before and attempt to maintain control over the child, sometimes by introducing drugs or alcohol into the relationship. Long-term effects of grooming can include low self-esteem, acting out delinquently, running away from home, stealing, and truancy. Problems at school can vary significantly based on whether the victim is male or female. If the child engages in illegal activity, the offender gains even more control by giving the child the message that he may engage in those activities with her approval even when other people in his life would disapprove or punish him. Recent articles advise that male victims will typically deny sexual abuse, even when they are asked directly.

We conclude that Dr. Vandiver sufficiently articulated the specific principles upon

which her testimony would rely. We therefore conclude that Dr. Vandiver's testimony was reliable.[49]

## 3. Relevance

We next turn to the question of whether Dr. Vandiver's testimony was relevant to assist the jury. For the proffered expert testimony to be relevant to assist the jury, the expert must make an effort to tie pertinent facts of the case to the principles that are the subject of her testimony.[50] Rule of Evidence 703 permits an expert to base her opinion testimony on data and facts made known to her during trial.[51] An expert witness's testimony may also consist of answers to a hypothetical questions.[52] Although the hypothetical questions must be based on facts in evidence, there is no requirement that these facts be proved beyond a reasonable doubt.[53] Indeed, in propounding the question to the witness, counsel may assume the facts in accordance with his theory of the case.[54] An expert's testimony is not irrelevant simply because it is based on information provided by the defendant or a member of his

---

[49] *See Osbourn*, 92 S.W.3d at 538.

[50] *Tillman*, 354 S.W.3d at 438 (citing *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)).

[51] *Id.* at 439.

[52] *McBride v. State*, 862 S.W.2d 600, 610 (Tex. Crim. App. 1993).

[53] *Id.*

[54] *Id.* at n.20.

family.[55] The fact-finder judges the credibility of the evidence and, consequently, the opinion of the expert witness based on that evidence.[56]

Dr. Vandiver stated that after the defense team contacted her, she reviewed Olsen's and Sifuentez's letters to each other. She also interviewed Olsen's mother, who explained her perception of the nature of Sifuentez's relationship with Olsen. Dr. Vandiver also reviewed Olsen's juvenile records, including reports prepared by Olsen's mental-health-care providers, and Sifuentez's mental health records.

Based on the information that was provided to her, Dr. Vandiver testified that Sifuentez's relationship with Olsen was consistent with the grooming profile. There was information that from the time when Olsen was fourteen, Sifuentez, who was then thirty-six years old, systematically engaged in behaviors that undermined Olsen's parents' authority, alienated him from his family, and encouraged and assisted him in delinquent behaviors such as running away, theft, and truancy. Sifuentez entered and exited Olsen's bedroom through the window late at night to bring him food. She also provided him with a cell phone after his parents took his phone away from him. Dr. Vandiver testified that these were "hallmarks" of grooming. Sifuentez also called Olsen late at night, and her calls were often followed by

---

[55] *See Fielder v. State*, 756 S.W.2d 309, 321 (Tex. Crim. App. 1988); *see also Williams v. State*, 895 S.W.2d 363, 365–66 (Tex. Crim. App. 1994) (discussing *Duckett* and *Cohn* as examples of cases in which experts ' testimony was appropriately linked relevant principles to the facts of the cases when lay witnesses testified that the child victims displayed some of the characteristics that the experts had testified were commonly displayed by child victims of sexual abuse).

[56] *See McBride*, 862 S.W.2d at 610; *Jordan*, 928 S.W.2d at 556.

Olsen sneaking away to her house. Sifuentez refused to answer her door when Olsen's parents went to her house looking for him. At Olsen's high school, Sifuentez's contact information was substituted for Olsen's parents' information, so that Sifuentez rather than Olsen's parents would be notified when he was truant.

Before Olsen met Sifuentez, he played several team sports, participated in church groups, and regularly attended church and school. The juvenile records confirmed that Olsen's parents reported their concerns about an inappropriate relationship to the juvenile authorities, who made notes of them in Olsen's records but took no further action. Olsen's mother testified that Olsen's conduct and his relationship with his parents would improve during periods when he was away from Sifuentez, but would deteriorate again when the two regained contact.

In response to hypothetical questions that mirrored the facts of the case, Dr. Vandiver explained that this scenario was consistent with the typical grooming behavior of a female sex offender and the typical response of a teenaged male victim who had been the target of grooming. The record reflects that Dr. Vandiver properly applied the relevant concepts from her area of expertise to hypothetical questions based on the facts in evidence.

The State contends that the core issue comes down to the relevance of Dr. Vandiver's testimony because there was no direct evidence that Sifuentez committed a sex offense with Olsen, and thus the principles of grooming were not relevant to the facts of the case. However, the record shows that when Olsen was a child, Sifuentez wrote him romantic

letters. Sifuentez would visit Olsen's bedroom at night. And Olsen would spend nights with Sifuentez at her home, even when Sifuentez's daughter was not there. Dr. Vandiver testified that the grooming process sometimes develops years before there is a sex act, and the grooming is more harmful to the child than the sex act. While the State might be correct that this evidence does not prove beyond a reasonable doubt that Sifuentez committed a discrete sex offense, this was not a prerequisite to the admissibility of Dr. Vandiver's testimony.[57]

The State also argues that the trial judge's ruling should be upheld because, even before Olsen met Sifuentez, he acted out as a child by lying and committing theft. While this might be an argument regarding the weight the jury should give to Dr. Vandiver's testimony, it does not render Dr. Vandiver's testimony irrelevant.[58]

In a footnote in its brief, the State suggests that the trial judge's ruling could be supported under Texas Rule of Evidence 403. Specifically, the State asserts that without direct evidence of a sexual relationship between Sifuentez and Olsen, Dr. Vandiver's testimony that Sifuentez's actions were consistent with a female sex offender poses the danger of unfair prejudice. The State also asserts that Dr. Vandiver's testimony is cumulative of other evidence and would have likely confused the jury. In light of our relevance analysis, we are not persuaded that the State's arguments under Rule 403 are

---

[57] *See id.* at 610 (noting that the facts upon which an expert testimony is based do not need to be proved beyond a reasonable doubt and that the expert may assume the truth of the facts in order to give her testimony).

[58] *See McBride*, 862 S.W.2d at 610; *Jordan*, 928 S.W.2d at 556.

theories that require us to sustain the trial court's ruling.

*4. Conclusion*

Based on the foregoing, we hold that the trial judge abused his discretion by excluding Dr. Vandiver's testimony. Moreover, the record does not support any other theory upon which we should sustain the trial judge's ruling.[59] Thus, we consider whether this error harmed Olsen.

**C. Harm Analysis**

The erroneous exclusion of constitutionally relevant mitigating evidence offered by a defendant facing a possible death sentence is analyzed for harm under Texas Rule of Appellate Procedure 44.2(a).[60] Such error requires reversal unless we determine beyond a reasonable doubt that it did not contribute to the punishment.[61]

In reviewing the record, Olsen's need for Dr. Vandiver's testimony is obvious. At the punishment phase, the defense sought to attribute much of Olsen's delinquent and criminal

---

[59] *See Osbourn*, 92 S.W.3d at 538 (citing *Moreno*, 341 S.W.2d at 456, 170 Tex. Crim. at 411).

[60] *See Renteria v. State*, 206 S.W.3d 689, 698 & n.7 (Tex. Crim. App. 2006) (citing *Tennard v. Dretke*, 542 U.S. 274, 284–87 (2004), and applying a Rule 44.2(a) harm analysis to an erroneous exclusion of constitutionally relevant mitigating evidence); *see also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 240–44 (2007) (describing expert witness's testimony as mitigating evidence and finding constitutional error when the trial judge refused to give an instruction that would have enabled the jury to give it meaningful consideration); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986) (holding that erroneous exclusion of lay witnesses' testimony that might have affected the jury's decision to impose the death sentence constituted reversible error "under any standard").

[61] *Renteria*, 206 S.W.3d at 698.

conduct to his relationship with Sifuentez, while the State sought to minimize the possibility that Sifuentez's influence had any effect on Olsen. The State acknowledged that there was evidence of a romantic and inappropriate relationship when Olsen was younger than seventeen, but argued that this relationship was irrelevant because there was no direct evidence of sexual activity before Olsen moved in with Sifuentez. Alternatively, the State took the position that even if Olsen had a sexual relationship with Sifuentez before he turned seventeen, this relationship would not have harmed him or caused him to act out negatively.

The State's future-dangerousness expert testified that it was not uncommon for fourteen- and fifteen-year-old boys to have sex. He did not give a direct answer when he was asked whether a sexual relationship between a fifteen-year-old boy and a thirty-five-year-old woman would negatively affect the boy's behavior; instead, he stated that the boy would probably "be grateful" to the woman who had sex with him. He testified through the use of hypothetical questions that it was just as likely that Olsen did not like the rules in his parents' house and preferred a permissive household such as Sifuentez's because he was delinquent and antisocial, as it was that Olsen became delinquent and antisocial as a result of Sifuentez's influence. In arguing that Olsen's relationship with Sifuentez was not significant and did not involve sexual abuse, the State emphasized that Olsen's mental-health and juvenile records contained no admission by Olsen that he was dating an older woman, no outcries of sexual abuse, and no referrals to protective services. The State also emphasized that Olsen did not meet Sifuentez until he was fourteen years old, but that he had lied since the age of ten and

began stealing at the age of twelve.

The prosecutor also discredited Olsen's parents' testimony about their concerns and suspicions regarding Sifuentez, arguing that Sifuentez could not have influenced Olsen unless he was already inclined to delinquency, and that Olsen's parents were driven by their love for their son into rationalizing his delinquent and criminal behavior. Finally, the State argued that Sifuentez had nothing to do with the offense of conviction and an extraneous murder offense the State argued he committed, asserting that there was no evidence of Sifuentez's involvement and that Olsen was just trying to cloud the issue and divert responsibility.

At the same time that the State sought to discredit the defense's position that Olsen's relationship with Sifuentez negatively affected him, it relied on Olsen's mental health records and his records of delinquent and criminal behavior as evidence that Olsen had a conduct disorder as a juvenile and an antisocial personality disorder as an adult, and therefore he would be a future danger.

Olsen's inappropriate relationship with Sifuentez, and its potential negative effect on him, were the core of the defense's case at punishment. Dr. Vandiver's proffered testimony would have provided the jury with a framework for understanding the potential mitigating value of much of the other mitigating evidence. Her testimony would have educated the jury concerning the harmful effects and influence that a relationship like the one between Sifuentez and Olsen could have on a teenaged boy, and the typical behavioral problems

exhibited by the victims of such relationships. Her testimony would have responded to the State's position that this relationship was not harmful and that Olsen would not have acted out unless he was already inclined to delinquency. In addition, Dr. Vandiver's testimony would have challenged the State's position that such a relationship would have shown up in Olsen's juvenile and mental health records if it had existed or if it had been significant to Olsen.

Thus, without Dr. Vandiver's testimony, the jury was unable to fully comprehend the mitigating potential of the evidence that was before it.[62] Further, Olsen was unable to respond to the State's evidence and argument discounting the mitigating potential of this evidence, and he was unable to explain or rebut the State's future-dangerousness evidence and argument.[63] Because we are unable to determine beyond a reasonable doubt that the erroneous exclusion of Dr. Vandiver's testimony did not contribute to the punishment, we sustain issues fifteen and sixteen.

## IV. REMAINING ISSUES

### A. Punishment Charge

In issues eighteen and nineteen, Olsen complains that the trial judge erred in

---

[62] *See Skipper*, 476 U.S. at 8 (holding that erroneous exclusion of relevant mitigating evidence required reversal when it impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender).

[63] *See Renteria*, 206 S.W.3d at 696–98 (citing *Skipper*, 476 U.S. at 9–15 (Powell, J., concurring) (arguing that the defendant's death sentence should be vacated, not because the trial court excluded "relevant mitigating evidence," but because the defendant "was not allowed to rebut evidence and argument used against him")).

overruling his objections to the punishment charge on grounds that it did not include definitions for "probability" and "reduce moral blameworthiness." In issue twenty, Olsen complains that the trial court erred because the punishment charge did not instruct the jury that "society meant society in prison—– not in the free world." We have previously rejected these and similar complaints in other cases.[64] Issues eighteen, nineteen, and twenty are overruled.

In issue twenty-one, Olsen argues that he was denied a fair and impartial punishment trial when the trial judge overruled his objection that the punishment charge did not contain an instruction requiring that extraneous offenses or misconduct be proven beyond a reasonable doubt. During the punishment phase, the State presented evidence that Olsen was involved in the death of Geraldine Lloyd, Sifuentez's elderly mother. In issue twenty-two, he complains that the trial judge overruled his objection that the jury was not instructed that "it could not consider the murder of Geraldine Lloyd in answering the special issues unless [jurors] believed beyond a reasonable doubt that [Olsen] caused [her death]."

In his brief, Olsen acknowledges that this Court has rejected these and similar arguments in the past and has held that as long as the punishment charge properly requires that the State prove the special issues, other than the mitigation issue, beyond a reasonable doubt, there is no unfairness in not including an instruction regarding the burden of proof for

---

[64] *See, e.g., Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010); *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); *Martinez v. State*, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996).

extraneous offenses.[65]   The record in this case shows that the jury received instructions properly requiring that the special issues, other than the mitigation issue, be proven by the State beyond a reasonable doubt.  The trial judge did not err in overruling Olsen's objections. Issues twenty-one and twenty-two are overruled.

In issue twenty-three, Olsen complains that he was denied a fair and impartial punishment trial because the punishment charge limited the jury's consideration of mitigating evidence to that which might "reduce moral blameworthiness," which he alleges is constitutionally impermissible.  In issue twenty-four, Olsen complains that the punishment charge did not "instruct jurors that the State is required to prove beyond a reasonable doubt there is not sufficient mitigating circumstances to warrant a sentence of death."  The punishment charge in this case followed the language of Article 37.071.  These and similar arguments challenging Article 37.071 have been previously rejected by this Court in other cases.[66]  Olsen provides us with no reason to review our precedent in this area.  These issues are overruled.

## B. Future Dangerousness

In issue thirty, Olsen challenges the legal sufficiency of the evidence supporting the jury's future-dangerousness finding.  When reviewing a legal-sufficiency challenge to a jury's finding of future dangerousness, "we view the evidence in the light most favorable to

---

[65] *See, e.g.*, *Hunter v. State*, 243 S.W.3d 664, 674 (Tex. Crim. App. 2007); *Jackson v. State*, 992 S.W.2d 469, 477 (Tex. Crim. App. 1999).

[66] *See, e.g.*, *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007).

the jury's finding and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society."[67] A jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[68] For example, the facts of the offense alone may be sufficient to sustain the jury's finding of future dangerousness.[69] We must view all of the evidence in the light most favorable to the jury's finding and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the future-dangerousness issue was "yes."[70]

In addition to the facts surrounding Olsen's murder of Westbrook, the jury heard testimony that Olsen had previously stolen and used Westbrook's credit cards without her permission. In March 2007, Olsen employed the ruse of needing to use the telephone to enter Westbrook's home to gain access to her credit cards.

The jury also heard evidence of Olsen's delinquent and criminal history. Olsen was adjudicated delinquent for theft and for felony credit-card abuse. He was given the

---

[67] *Berry*, 233 S.W.3d at 860 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)).

[68] *Wardrip v. State*, 56 S.W.3d 588, 594 & n.7 (Tex. Crim. App. 2001); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

[69] *Fuller v. State*, 253 S.W.3d 220, 231–32 (Tex. Crim. App. 2008); *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995).

[70] *Ladd v. State*, 3 S.W.3d 547, 557–58 (Tex. Crim. App. 1999).

opportunity to complete a conditional-release program, but he violated the conditions of that program by taking his parents' car. He was then placed on formal probation. Olsen violated the terms of his probation by cutting off his electric monitor, refusing to obey his parents, violating his curfew, running away, having a prohibited cell phone, and taking money from his mother's purse.

Because of these violations, Olsen's probation was modified, and he was placed in a boot-camp facility. Upon his release from the facility, Olsen again violated the terms of his probation by not attending school. He was once again fitted with an electronic monitor, which he cut off. Olsen's probation was again modified, and he was sent to complete his probation at Miracle Farm, a residential outreach facility for at-risk boys, where he completed high school before his release in December 2004.

In January 2006, after he turned eighteen, Olsen's parents asked him to leave their home. As an adult, Olsen continued to run afoul of the law. He was convicted of evading arrest, theft by check, forgery of a financial instrument, and theft of property. He also had two unadjudicated offenses of admitted to driving with an invalid license twice. Olsen committed the instant offense when he was nineteen. Sergeant Kevin Stuart with the Brazos County Sheriff's Office testified that in his opinion, Olsen was a bad inmate during his incarceration prior trial for this offense.

The State also presented psychological testimony from several sources. Michelle Fecowycz, a psychologist with Brazos County Juvenile Services, interviewed Olsen during

the time he was supervised by the juvenile probation department. The following portion of her report was read to the jury:

> Personality testing suggested significant unruly personality traits where he is resistant to limits that are placed on his behavior and tends to be rejecting of social norms for age-appropriate behavior. Besides his criminal behavior, there also appears to be a pattern of lying in an attempt to avoid consequences that is more intense than what is expected for his age.

The jury also heard Fecowycz's assessment that Olsen was "lacking remorse, as most feelings of regret over his behavior seem to occur only when he is caught doing something wrong." In evaluating Olsen's personality, Fecowycz found that Olsen presented a "dramatizing, egotistical personality style, where narcissistic attitudes are present as well as self-centeredness."

Before Olsen was placed on juvenile probation, his parents sent him to Dr. DeWayne Taylor for counseling. Dr. Taylor continued to provide the majority of Olsen's mental health care during his probation. Dr. Taylor prepared a report that was contained in Olsen's juvenile record and read, in part, to the jury. The jury heard Dr. Taylor's assessment of Olsen, which "point[ed] to the presence of a conduct disorder/oppositional-defiant disorder pattern and an emerging narcissistic/histrionic/antisocial personality." The jury also heard Dr. Taylor's statement that "[a]ccording to [Olsen's] parents, his tendency to lie to get out of trouble and to build himself up dates back to at least age 10."

Finally, the State presented evidence that Olsen was involved in the death of Geraldine Lloyd, Kelly Sifuentez's elderly mother. In the summer of 2007, after receiving

information regarding Lloyd's death, police obtained a warrant to search the back yard of the home Lloyd had shared with Olsen and her daughter. Police found Lloyd's body buried there. Kelly Sifuentez and Olsen were indicted for Lloyd's murder. A couple of witnesses testified that they had been told by Kelly or Melissa Sifuentez that Olsen killed Lloyd. Olsen admitted to a detention officer that he buried Lloyd's body. Lloyd died from a massive blow to the head, which law-enforcement theorized had been done while she slept.

Having viewed all of the evidence in the light most favorable to the jury's finding, we determine, based on that evidence and reasonable inferences therefrom, that a rational jury could have found beyond a reasonable doubt a probability that Olsen would pose a continuing threat to society. We overrule issue thirty.

## C. Pre-Trial Motion to Preclude the Death Penalty

In issues thirty-one and thirty-two, Olsen alleges that the trial judge erred in denying his pre-trial motion to preclude the death penalty because of his age. At the time of the offense, Olsen was just a few weeks from his twentieth birthday. The Supreme Court of the United States has stated that "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest."[71] Olsen has not persuaded us that he should be ineligible for the death penalty due to his age at the time of the offense. We overrule these issues.

---

[71] *Roper v. Simmons*, 543 U.S. 551, 574 (2005).

**D. Constitutional Challenges to Texas's Death Penalty Statute**

Olsen presents several other issues regarding errors in the punishment charge and the constitutionality of Texas's death penalty statute. In issue thirty-six, Olsen contends that Article 37.071 violates the Eighth and Fourteenth Amendments because predictions of future dangerousness are so inaccurate that the future-dangerousness special issue cannot be answered with any degree of constitutional reliability. Olsen argues that "juries affirmatively answering the future dangerousness special issue get it wrong 95% of the time." As evidence in support of his argument, he presents a citation to an article written by the Texas Defender Service, an advocacy group that represents inmates on death row.[72]

We addressed this claim in *Coble*, pointing out that as recently as 2008, the Supreme Court of the United States recognized the future-dangerousness aggravating factor as properly narrowing the jury's consideration to ensure individualized sentencing.[73] We also pointed out that the article presented in that case, which is the same article that Olsen presents in support of his argument here, "is not the type of 'evidence' upon which we can base a finding that the 'future dangerousness' special issue is necessarily an unreliable factor to use in determining whether a life or death sentence is appropriate."[74] We overrule issue thirty-six.

---

[72] *See generally* TEXAS DEFENDER SERVICE, DEADLY SPECULATION: MISLEADING TEXAS CAPITAL JURIES WITH FALSE PREDICTIONS OF FUTURE DANGEROUSNESS (2004).

[73] *See Coble*, 330 S.W.3d at 297.

[74] *Id*. at 298.

In issues thirty-three through thirty-five, Olsen alleges that Texas Code of Criminal Procedure Article 37.071 is unconstitutional because it impermissibly limits the definition of mitigating evidence to evidence that jurors might regard as reducing a defendant's moral blameworthiness. In issues thirty-seven and thirty-eight, Olsen argues that Article 37.071 violates the Sixth and Eighth Amendments of the U.S. Constitution because it impermissibly places the burden on a defendant to prove sufficient mitigating circumstances. In issues thirty-nine through forty-five, Olsen alleges that the Texas death penalty scheme is unconstitutional under the U.S. Constitution. Olsen complains that the capital sentencing scheme does not permit meaningful appellate review; at least ten "no" votes are required for the jury to return a negative answer to the punishment special issues (the "10-12 Rule"); and Article 37.071 prevents jurors from learning of the effect of even one life vote. We have previously rejected these and similar arguments challenging Article 37.071 in other cases.[75] Olsen does not distinguish this case from our prior decisions, and we decline to overrule our precedent in these areas. We overrule these issues.

## V. CONCLUSION

Based on the foregoing, we affirm Olsen's conviction. We reverse his sentence and remand this case to the trial court for a new punishment hearing.

---

[75] *See, e.g.*, *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007); *Perry v. State*, 158 S.W.3d 438, 446–48 (Tex. Crim. App. 2004); *Feldman*, 71 S.W.3d at 757.

DELIVERED: April 25, 2012
DO NOT PUBLISH